## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BOBBY JOHNS WILEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:16-CV-1936-CLS** |
| | ) | |
| **UNITED OF OMAHA LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Bobby Johns Wiley, was employed by non-party Camber Corporation as a "Senior Business Systems Analyst," a position that required him to provide software analysis, design, and programming support to the United States military and other departments and agencies of national government.  While so employed, plaintiff was a beneficiary of group short-term and long-term disability policies issued to Camber Corporation, and administered on behalf of that corporation by defendant, United of Omaha Life Insurance Company ("defendant").  The denial of plaintiff's claim for long-term disability benefits led to this suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., "to recover benefits [allegedly] due to [plaintiff] under the terms of the plan." *Id*. § 1132(a)(1)(B)

(alterations supplied).[1]  The action is before the court for decision on the parties'

cross-motions for summary judgment.[2]  Upon consideration of those motions, the

materials available to defendant when the decision to deny plaintiff's claim was

made,[3] the parties' briefs,[4] and oral arguments of counsel, the court enters the

following memorandum of opinion.

## I. SUMMARY JUDGMENT STANDARDS

Courts may grant summary judgment when the moving party shows that "there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" if there is

sufficient evidence for a reasonable fact finder to return a verdict in favor of the

non-moving party, and it is "material" if resolving the issue might change the suit's

outcome under the governing law.  *See*, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477

---

[1] *See* doc. no. 1 (Complaint); doc. no. 3 (Amended Complaint).

[2] *See* doc. no. 26 (Plaintiff's Motion for Summary Judgment), and doc. no. 28 (Defendant's Motion for Summary Judgment on the ERISA Administrative Record).

[3] *See* doc. no. 25 ("Joint Notice of Filing ERISA Administrative Record Under Seal").  **NOTE WELL**:  Hereafter, all references to the Administrative Record will be cited as "**Doc. no. 25, at** [*specific page number(s)*]."  Further, each page of that record was sequentially numbered, beginning with "UNITED-000001," and continuing through (and concluding with) "UNITED-001545."  For convenience, the "UNITED" prefix and leading zeros will be omitted from citations in this opinion.

[4] *See* doc. no. 27 (Plaintiff's Brief in Support of Motion for Summary Judgment); doc. no. 33 (Defendant's Brief in Response to Plaintiff's Motion for Summary Judgment); doc no. 34 (Plaintiff's Reply); doc. no. 29 (Defendant's Brief in Support of its Motion for Judgment on the ERISA Administrative Record); doc. no. 32 (Plaintiff's Response to Defendant's Motion for Judgment on the ERISA Administrative Record); doc. no. 35 (Defendant's Reply).

U.S. 242, 248 (1986). A motion for summary judgment should be granted only when no rational fact-finder could return a verdict in favor of the non-moving party. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding that summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).[5]

---

[5] Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover, the

> mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). If the evidence supporting the nonmoving party is not significantly probative, summary judgment may be granted. *See*, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *see also id.* at 251-52 (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). The non-moving party's failure of proof as to any essential element renders all other facts immaterial. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The standards for reviewing cross-motions for summary judgment do not differ from those applied when only one party files such a motion, but simply require a determination of whether either party is entitled to judgment as a matter of law on the basis of material facts that are not genuinely disputed. *See*, *e.g.*, *American Bankers Insurance Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id*.[6] "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id*. at 1555-56.

## II. STANDARDS FOR REVIEWING AN ERISA PLAN ADMINISTRATOR'S DENIAL OF BENEFITS

The Employee Retirement Income Security Act does not provide a standard for courts reviewing the benefit decisions of plan administrators. *See*, *e.g.*, *Firestone*

---

[6] *See also*, *e.g.*, 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at 353 (2016) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.") (footnote omitted).

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 108-09 (1989).  As a result, the Eleventh

Circuit established the following, multi-step framework to guide reviewing courts:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; [*on the other hand*,] if reasonable grounds do exist, then determine if [*the administrator*] operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metropolitan Life Insurance Co.*, 644 F.3d 1350, 1355 (11th Cir.

2011) (alterations supplied) (citing *Capone v. Aetna Life Insurance Co.*, 592 F.3d

1189, 1195 (11th Cir. 2010)); *see also, e.g.*, *Metropolitan Life Insurance Co. v.

Glenn*, 554 U.S. 105, 115-19 (2008); *Williams v. BellSouth Telecommunications, Inc.*,

373 F.3d 1132, 1137-38 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1359-60 (11th Cir. 2008).

It is important to note that a court's review of an ERISA plan administrator's benefit-eligibility decision "is limited to consideration of the material available to the administrator at the time it made its decision." *Blankenship*, 644 F.3d at 1354 (citing *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989)). In that regard, the Administrative Record available to defendant when considering plaintiff's claim for long-term disability benefits was stipulated by the parties, and filed under seal as document number 25.[7] Review of those materials proved difficult, however, due to the manner in which they had been compiled. The documents were not grouped in a logical order (*e.g.*, by date of preparation or examination, name of physician or generating entity, *etc.*). Numerous repetitions were scattered throughout. Many pages were not clearly legible, and the text of some was obliterated on the right margin due to the manner in which the pages had been misplaced on a copy machine screen.

Accordingly, this court reviewed each of the 1,545 pages of the Administrative Record, and identified those portions that appeared most relevant and material to defendant's decision, and then organized them in chronological order. The product

---

[7] See note 3, *supra*.

of that work was provided to counsel in advance of oral arguments, and is reproduced in the "APPENDIX" to this opinion. Counsel were directed, in advance of oral arguments, to compare the materials summarized in the appendix to the administrative record, and to determine whether this court had overlooked any portions that counsel believed relevant and material to defendant's decision (and, if so, to identify the additional portions by page numbers). The additional materials referenced by plaintiff's counsel were filed as doc. nos. 39 and 41, and those identified by defendant's attorneys were filed as doc. no. 38.

### III. DISCUSSION

The Group Long-Term Disability policy issued to Camber Corporation and administered on behalf of that entity by defendant provided that: "If You become Disabled due to an Injury or Sickness, while insured under the Policy, We will pay the Monthly Benefit shown in the Schedule in accordance with the terms of the Policy. Benefits will begin after You satisfy the Elimination Period shown in the Schedule."[8] The policy defined "disability" and "disabled" as follows:

> *Disability* and *Disabled* mean that[,] because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
>
> a) during the Elimination Period,[9] You are prevented from

---

[8] Doc. no. 25, at 358 (capitalization in original).

[9] "Elimination Period" was defined as "the number of days of Disability which must be

7

performing at least one of the Material Duties of Your Regular
Occupation on a part-time or full-time basis; and

b) after the Elimination Period, You are:

1. prevented from performing at least one of the Material Duties
of Your Regular Occupation on a part-time or full-time basis;
and

2. unable to generate Current Earnings which exceed 99% of
Your Basic Monthly Earnings due to that same Injury or
Sickness.

---

satisfied before You are eligible to receive benefits. The elimination period is shown in the
Schedule." Doc. no. 25, at 370 ("General Definitions" section). The "Schedule," set out on the
second page of the long-term disability policy, states that the "Elimination Period" is "The latter of:
a) 90 calendar days; or b) the date Your short-term Disability ends." *Id*. at 348. A more extensive
definition of "Elimination Period" is found on the fifth page of the long-term disability policy (the
"Definitions" section), and reads as follows:

The Elimination Period is the later of:

a) 90 calendar days; or
b) the date Your short-term Disability ends.

For purposes of accumulating days of Disability to satisfy the Elimination Period, the
following will apply:

a) a period of Disability will be treated as continuous during the Elimination
Period unless Disability stops for more than 90 accumulated days during the
Elimination Period; and

b) days in which You return to work for a full work day as verified by
Policyholder records will not count towards the Elimination Period.

The Elimination Period begins on the first day of Disability. If You are not
continuously Disabled, the Elimination Period must be satisfied within a period of
time which does not exceed two times the length of the Elimination Period;
otherwise, a new Elimination Period will apply.

*Id*. at 351.

After a Monthly Benefit has been paid for 2 years, *Disability and Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

Doc. no. 25, at 370 (italics in original, alteration and footnote supplied).

"Injury" was defined as meaning "an accidental bodily injury that requires treatment by a Physician. It must result in loss independently of Sickness and other causes. Disability resulting from an injury must occur while You are insured under the Policy." *Id*. In contrast,

*Sickness* means a disease, disorder or condition, including pregnancy, that requires treatment by a Physician. Disability resulting from a sickness must occur while you are insured under the Policy. Sickness does not include elective or cosmetic surgery or procedures, or resulting complications. Sickness includes the donation of an organ in a non-experimental organ transplant procedure.

*Id.* at 372 (italics in original).

Two other policy terms, "Material Duties" and "Regular Occupation," were defined as follows:

*Material Duties* means the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified. In no event will We consider working an average of more than the required Full-Time hours per week in itself to be a part of material duties. One of the material duties of Your Regular Occupation is the ability to work for an employer on a full-time basis.

9

*Id*. at 371 (italics in original).

> *Regular Occupation* means the occupation You are routinely performing
> when Your Disability begins. Your regular occupation is not limited to
> Your specific position held with the Policyholder, but will instead be
> considered to be a similar position or activity based on job descriptions
> included in the most current edition of the U.S. Department of Labor
> Dictionary of Occupational Titles (DOT). We have the right to
> substitute or replace the DOT with another service or other information
> that We determine to be of comparable purpose, with or without pay. To
> determine Your regular occupation, We will look at Your occupation as
> it is normally performed in the national economy, instead of how work
> tasks are performed for a specific employer, at a specific location, or in
> a specific area or region.

*Id.* at 372 (italics in original).

## A.    Application of Circuit Framework to Administrative Record

**1.** "*Apply the* de novo *standard to determine whether the claim
administrator's benefits-denial decision is* '*wrong*' (i.e., *the court
disagrees with the administrator's decision*); *if it is not, then end the
inquiry and affirm the decision*."[10]

Following review of the evidence contained in those portions of the

administrative record referenced in the Appendix and doc. nos. 38, 39, and 41, this

court finds that plaintiff suffered from a number of medically determinable physical

impairments that limited his ability to perform most of the material duties of his

regular occupation as a Senior Business Systems Analyst with Camber Corporation,

and to maintain the attention and concentration required to perform repetitive

---

[10] *Blankenship v. Metropolitan Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (citation omitted, emphasis supplied).

analytical tasks on a sustained basis, which were essential functions of his position.

Accordingly, defendant's decision that plaintiff could perform all of the essential

functions of his job, and that he was not entitled to long-term disability benefits, was

"wrong."

> **2.** "*If the administrator's decision in fact is* 'de novo *wrong*,' *then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision*."[11]

Camber Corporation's long-term disability policy affirmed that defendant

possessed discretion to review claims and determine eligibility for benefits.

> By purchasing the Policy, the Policyholder [*Camber Corporation*] grants Us [*defendant, United of Omaha Life Insurance Company*] the discretion and the final authority to construe and interpret the Policy. This means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by Us. Benefits under the Policy will be paid only if We decide, in Our discretion, that a person is entitled to them.

Doc. no. 25, at 365 (alterations supplied); *see also* doc. no. 22 ("Joint ERISA Report

of [the] Parties"), ¶ 7 (stipulating that "the applicable policy delegates discretionary

authority to United of Omaha to determine eligibility for benefits and interpret the

provisions of the policy").[12]

---

[11] *Id*. (emphasis supplied).

[12] The full text of this paragraph of the parties' stipulation reads as follows: "**Parties' Joint Position:** The arbitrary and capricious standard of review applies because the applicable policy delegates discretionary authority to United of Omaha to determine eligibility for benefits and interpret the provisions of the policy." Doc. no. 22 ("Joint ERISA Report of Parties"), ¶ 7 (emphasis

**3.**     *"If the administrator's decision is* 'de novo *wrong' and he was vested with discretion in reviewing claims, then determine whether 'reasonable' grounds supported it* (*hence, review his decision under the more deferential arbitrary and capricious standard*)."[13]

Defendant's vocational consultant classified plaintiff's position of Senior Business Systems Analyst as "Sedentary," which means that it involved "sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." Doc. no. 25, at 905 (citing U.S. Department of Labor's *Dictionary of Occupational Titles*).[14]

Defendant's medical consultant found that plaintiff could "sit up to six hours in an eight-hour workday; and stand and walk up to six hours in an eight-hour workday." *Id*. at 984.

Both of the foregoing findings were contradicted by claimant's treating physicians.

Plaintiff's neurologist, Dr. Christopher LaGanke, diagnosed plaintiff's primary medical condition as demyelinating disease,[15] which caused parethesia,[16] pain,

---

in original).

[13] *Blankenship*, 644 F.3d at 1355 (emphasis supplied).

[14] Defendant's vocational consultant found that "claimant's job of Analyst most closely correlates with the occupation of Financial Analyst eDOT#161.067-011. The claimant's occupation is Sedentary in terms of strength level and would be considered skilled work." Doc. no. 25, at 905.

[15] A "demyelinating disease" is any condition that results in damage to the protective covering ("myelin sheath") that surrounds nerve fibers in a person's spinal cord. *See* DORLAND'S

fatigue, and weakness, and which had been objectively confirmed by electromyography ("EMG")[17] and electroencephalogram ("EEG") studies,[18] magnetic resonance imaging ("MRI") scans,[19] laboratory work, and physical and neurological

ILLUSTRATED MEDICAL DICTIONARY 488 (32nd ed. 2012) (hereafter "**DORLAND'S**") (defining demyelination as the "destruction, removal, or loss of the myelin sheath of a nerve or nerves"). When the *myelin sheath* is damaged, nerve impulses slow or even stop, causing neurological problems.

> Multiple sclerosis (MS) is the most common demyelinating disease of the central nervous system. In this disorder, [a person's] immune system attacks the myelin sheath or the cells that produce and maintain it. This causes inflammation and injury to the sheath and ultimately to the nerve fibers that it surrounds. The process can result in multiple areas of scarring (sclerosis).

https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/expert-answers/demyelinating -disease/faq-20058521 (alteration supplied) (last visited Feb. 20, 2019).

[16] "Paresthesia" is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S at 1383.

[17] Electromyography ("EMG") measures muscle response or electrical activity in response to a nerve's stimulation of the muscle. The test is used to help detect neuromuscular abnormalities. During the test, one or more small electrodes are inserted through the skin into the muscle. *See*, *e.g.*, https://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/electromyography_ 92,p07656 (last visited Mar. 26, 2019).

[18] An electroencephalogram ("EEG") is a test that detects electrical activity in a patient's brain using small, metal discs (electrodes) attached to the person's scalp. "This activity shows up as wavy lines on an EEG recording. An EEG is one of the main diagnostic tests for epilepsy. An EEG can also play a role in diagnosing other brain disorders." https://www.mayoclinic.org/tests-procedures/eeg/about/pac-20393875 (last visited Mar. 26, 2019).

**NOTE WELL:** doc. no. 25, at 398-400 (a July 17, 2015 report of EMG and EEG studies conducted seven months after plaintiff's December 2014 spinal surgeries, and which concludes with Dr. LaGanke's diagnosis: "These electrophyiological studies demonstrate marked slowing in a number of peripheral nerves indicative of a demyelinating neuropathy at this time." *Id*. at 400). *See also id*. at 404 (July 29, 2015 Letter to Plaintiff) ("The nerve conduction study you recently had done at our office showes [*sic*] a slowing in the peripheral nerves [*and*] shows some demyelinating neuropathy at this time.") (alterations supplied).

[19] "Magnetic resonance imaging (MRI) is a technique that uses a magnetic field and radio waves to create detailed images of the organs and tissues within your body." https://www.mayoclinic .org/tests-procedures/ mri/about/pac-20384768 (last visited Feb. 19, 2019). It is "one of the most commonly used tests in neurology and neurosurgery." https://www.casemed.case.edu/clerkships/

examinations.[20]  In addition, Dr. LaGanke diagnosed plaintiff as suffering from fibromyalgia,[21] peripheral neuropathy,[22] lumbar radiculopathy,[23] cervical stenosis,[24] myelopathy,[25] arthritis, migraine headaches, and IgG deficiency.[26]

---

neurology/web%20neurorad/mri%20basics.htm (last visited Feb. 21, 2019).

[20] *See*, *e.g.*, Appendix, *infra* at § A.2 (fibromyalgia, cervical stenosis, arthritis, and "mixed headache disorder"); *id*. at § A.4 ("myelopathy / demyelinating disease," migraine headaches, and fibromyalgia); *id*. at § A.5 (fibromyalgia, migraine headaches, demyelineating disease, and syringomyelia of the thoracic spine); *id*. at § A.6.c (fibromyalgia, thoracic syrinx, and demyelinating disease); *id*. at § A.7 (fibromyalgia and IgG deficiency); *id*. at § C.4 (lumbosacral degenerative disc disease, most prominent at L4-5 and L5-S1, and multiple vertebral body hemanglomata); *id*. at § E.5.e (demyelinating disease post-low-back surgery, IgG deficiency); *id*. at § K.2 (demyelinating disease, parethesia, pain, fatigue, weakness, peripheral neuropathy, lumbar radiculopathy, cervical stenosis, myelopathy, migraine headaches, and IgG deficiency).

[21] "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues.  Researchers believe that fibromyalgia amplifies painful sensations by affecting the way [a patient's] brain processes pain signals." https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780 (alteration supplied) (last visited Feb. 18, 2019).  *See also* DORLAND'S at 703 (defining fibromyalgia as "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points").

NOTE WELL:  The diagnosis of fibromyalgia was confirmed on or about October 25, 2011 by Dr. Kevin J. Myers, a rheumatologist on the staff of the Vanderbilt University Medical Center in Nashville, Tennessee.  *See*, *e.g.*, Appendix, *infra* at § A.3.

[22] Peripheral neuropathy is a result of damage to a person's peripheral nerves, and it often causes weakness, numbness and pain, usually in the hands and feet.  It also can affect other areas of the body.  *See, e.g.*, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited Mar. 26, 2019).

[23] Lumbar radiculopathy describes a disease involving the lumbar spinal nerve root, typically caused by compression of the spinal nerve root.  It can manifest as pain, numbness, or weakness of the buttock and leg.  The pain is often deep and steady, and can usually be reproduced with certain activities and positions, such as sitting or walking.  *See, e.g.*, https://www.spine-health.com/conditions/lower-back-pain/lumbar-radiculopathy (last visited Mar. 26, 2019).

[24] Cervical stenosis, also called cervical spinal stenosis, occurs when the neck's protective spinal canal narrows due to degenerative changes or trauma.  If the space within the spinal canal is reduced too much, neurologic deficits can result from spinal cord compression, a condition called myelopathy.  *See, e.g.*, https://www.spine-health.com/conditions/spinal-stenosis/cervical-stenosis-myelopathy (last visited Mar. 26, 2019).

[25] Myelopathy is a "general term for a disorder in which the tissue of the spinal cord is compressed and this leads to spinal cord dysfunction." https://www.spine-health.com/glossary/

As a result of the foregoing conditions, and following surgeries on plaintiff's lumbar and cervical spine during December of 2014,[27] Dr. LaGanke restricted plaintiff to sitting for not more than four hours during an eight-hour workday. *See* doc. no. 25, at 413. Four hours is half, not "most," of an eight-hour workday. Dr. LaGanke also limited plaintiff to standing for not more than *one to two* hours, and walking for *one to two* hours during the remaining four hours of a normal workday. *Id.*[28] Obviously, as defendant's attorney acknowledged during oral argument, if plaintiff's conditions limited him to standing for only one hour and walking for only one hour, in addition to four hours of sitting, he would not be able to complete a full, eight-hour workday. Further, during the six hours that plaintiff could work, Dr. LaGanke directed him to *alternate* between sitting, standing, and walking *every ten*

---

myelopathy (last visited Feb. 18, 2019).

[26] An "IgG deficiency" is a health problem in which a person's body does not make sufficient amounts of *Immunoglobulin G* ("IgG"). Persons with such deficiencies are more likely to contract infections. When a person's body senses it is under attack by an infection, it makes special proteins called "immunoglobulins" or "antibodies." Those antibodies are made by plasma cells. "They are let loose throughout the body to help kill bacteria, viruses, and other germs. The body makes 5 major types of immunoglobulins: Immunoglobulin A; Immunoglobulin G; Immunoglobulin M; Immunoglobulin D; and, Immunoglobulin E. Immunoglobulin G (IgG) is the most common type. IgG has 4 different subclasses, IgG1-4. IgG is always there to help prevent infections. It's also ready to multiply and attack when foreign substances get into the body. When you don't have enough, you are more likely to get infections." https://www.hopkinsmedicine.org/healthlibrary/conditions/allergy_and_asthma/igg_deficiencies_134,109 (last visited Feb. 24, 2019).

[27] *See* Appendix, *infra* § E (discussing both of plaintiff's surgeries at the Laser Spine Institute in Tampa, Florida).

[28] The opinions quoted in text were given in response to the question: "In an eight-hour workday, the patient can: (Circle full hourly capacity for each activity.)." Doc. no. 25, at 413 (emphasis in original).

*to fifteen minutes*. *Id*. at 414. There is no evidence in the administrative record indicating that plaintiff could perform the material duties of his regular occupation with such frequent changes in position — especially in view of the additional restriction noted by Dr. LaGanke on plaintiff's "Use of [*his*] hands in repetitive actions" (*e.g.*, *typing on a keyboard* ). *Id*. at 413 (alteration supplied).[29]

The restrictions imposed by Dr. David Francis, plaintiff's primary care physician, were even more restrictive than those of Dr. LaGanke. Dr. Francis diagnosed plaintiff as suffering from back pain and weakness due to disc disease and peripheral neuropathy that had been objectively confirmed by MRI scans and nerve conduction studies, and limited him to a total of only three hours of sedentary work during any given workday: specifically, one hour of sitting; one hour of standing; and one hour of walking. *See* doc. no. 25, at 431.[30] Dr. Francis also concluded that plaintiff was not able to: "Perform repetitive, or short cycle work"; "Perform at a

---

[29] This restriction was noted by Dr. LaGanke's check of "Yes" in response to the question "Are there restrictions in . . . [*among other activities listed*] Use of hands in repetitive actions," and his corresponding handwritten comment: "Not repetively [*sic*] due to numbness of upper & lower extremities." *Id*. at 413 (alteration supplied).

**NOTE WELL**: Dr. LaGanke's February 16, 2015 neurological examination notes, recording that plaintiff "is a computer programmer" who finds it "very difficult to stay focused. 'Suddenly forget' what he is doing. . . . Since neck fusion has difficulty turing [*sic*] his head." Doc. no. 25, at 1235-36 (ellipsis supplied); *see also* Appendix, *infra* at § E.5.e (same).

[30] The restrictions for each activity quoted in text were given in response to the question: "In an eight-hour workday, the patient can: (Circle full hourly capacity for <u>each</u> activity.)." *Id*. at 431 (emphasis in original). *See also id*. at 1362 (same).

constant pace"; or "Work alone or apart in physical isolation from others." *Id*.[31] He

concluded that plaintiff could do "no work," and that he "never" would be able to

return to his prior level of functioning. *Id*. at 432; *see also id*. at 1363 (same).

It is true that neither of plaintiff's treating physicians responded to the letters

mailed by defendant, requesting each to agree with defendant's contrary conclusions

about plaintiff's functional abilities. While the doctors' non-responsiveness was (to

say the least) not helpful to their patient, the court finds that their failure is entitled

to little weight in evaluating the reasonableness of defendant's decisions. Indeed, the

failure of treating physicians to respond to a follow-up request for additional

information is no reason to disregard medical diagnoses that have been well

documented by extensive records of physical examinations, supporting tests, and

actual treatments conducted over a period of years. Ignoring the breadth and depth

of such objective evidence allows insurance companies to subvert meritorious claims

by simply increasing the paperwork burden on a claimant's physicians.

In summary, defendant lacked reasonable grounds to support its conclusion that

plaintiff was able to perform all of the material duties of his regular occupation on a

full-time basis. Based upon the assessments of *both* of plaintiff's treating physicians,

---

[31] The restrictions stated in text were checked as "Unable to Perform" in response to the statement: "Please check off the appropriate response of the person's ability to adapt to these specific job situations at this time." *Id*. at 431; *see also id*. at 1362 (same).

plaintiff is unable to sit for most of an eight-hour workday, and he is unable to perform any combination of work functions on a full-time basis. Because there were no reasonable grounds for defendant's decision to deny plaintiff's long-term disability benefits, that decision was arbitrary and capricious, and due to be overturned.

**4.** *"If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision;* [on the other hand,] *if reasonable grounds do exist, then determine if he operated under a conflict of interest."*[32]

This court concludes that defendant lacked reasonable grounds to deny plaintiff's claim for long-term disability benefits. Consequently, the administrator's decision will be reversed by separate order.[33]

**DONE** this 20th day of May, 2019.

United States District Judge

---

[32] *Blankenship*, 644 F.3d at 1355 (emphasis and alteration supplied).

[33] This court notes in passing that defendant operated under an inherent conflict of interest as both insurer and claims administrator. *See id.* ("A pertinent conflict of interest exists where the ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds.") (citing *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 112, (2008)).

# APPENDIX
## SUMMARY OF MATERIAL FACTS CONTAINED IN THE ADMINISTRATIVE RECORD
### (Document No. 25)

A.    **Medical Evaluations Prior to May 20, 2013**

    **1.  October 8, 2010:** *neurological evaluation* — the initial examination of plaintiff by Cullman, Alabama neurologist Dr. Christopher LaGanke occurred on Friday, October 8, 2010, after which Dr. LaGanke dictated the following information for plaintiff's medical records:

> HPI [*i.e.*, *History of the Present Illness*]:  Mr. Wiley is a 41 YORHM [*presumably*, a 41 *Year-Old, Right-Handed Male*] seen in consultation from Dr. Francis [*i.e.*, *Dr. David A. Francis, plaintiff's Decatur, Alabama primary care physician*] for pain and ataxia.[34]  The patient states that he started having significant pain about 10 months ago.  The hips and knees bilaterally are most affected.  He states that he has a hard time getting up on stage without crutches.  He hobbles on flat ground and is quite unsteady on his feet.  He has been diagnosed with RA [*Rheumatoid Arthritis*] and OA [*Osteoarthritis*] and there has been a suspicion of fibromyalgia.  This past month he has had 2 episodes of

---

[34] Ataxia is a degenerative disease of the nervous system.  Many of its symptoms mimic those of intoxication — *e.g.*, slurred speech, stumbling, falling, and lack of coordination.  "All are related to degeneration of the part of the brain, called the cerebellum, that is responsible for coordinating movement.  Ataxia is a disease that affects people of all ages.  Age of symptom-onset can vary widely, from childhood to late-adulthood.  Complications from the disease are serious, oftentimes debilitating, and can be life-shortening."  https://ataxia.org/what-is-ataxia/ (last visited Feb. 18, 2019).  *See also* DORLAND'S at 170 (defining ataxia as the "failure of muscular coordination; irregularity of muscular action").

sleep paralysis.[35]   He has had periods of numbness from his neck distal.[36]  Since age 23 he has had a constant headache with occasional superimposed migraine.   Pt [*Patient*] denies any diplopia,[37] dysphagia,[38] and dysarthria.[39]   Pt denies any bowel or bladder dysfunction.

Doc. no. 25, at 849 (alterations and footnotes supplied).[40]

Dr. LaGanke's initial impression of plaintiff's presenting complaints was that

he suffered from "Myelopathy"[41] and a "Mixed headache disorder."[42]  *Id*. at 851.  Dr.

---

[35] "Sleep paralysis is a feeling of being conscious but unable to move. It occurs when a person passes between stages of wakefulness and sleep. During these transitions, [the person] may be unable to move or speak for a few seconds up to a few minutes. Some people may also feel pressure or a sense of choking."  https://www.webmd.com/sleep-disorders/guide/sleep-paralysis#1 (last visited Mar. 18, 2019) (alteration supplied).

[36] "Distal," when used  in reference to an anatomic position, means away from the midline or trunk, or away from the point of origin of a structure, such as a muscle or bone.  *See*, *e.g.*, https://thesurvivaldoctor.com/2011/10/04/what-do-distal-and-proximal-mean/ (last visited Mar. 25, 2019).

[37] Diplopia is "the perception of two images of a single object; called also . . . double vision."  DORLAND'S at 525.

[38] Dysphagia is "difficulty in swallowing."  DORLAND'S at 579.  "People with dysphagia may choke on saliva, liquids, or food."  https://my.clevelandclinic.org/health/diseases/13492-dysphagia (last visited Feb. 18, 2019).

[39] Dysarthria is "a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system."  DORLAND'S at 575.

[40] *See also* doc. no. 25, at 1181 (same).

[41] "Myelopathy is a disorder that results from severe compression of the spinal cord.  The only way to treat the compression of the spinal cord is through decompression surgery.  . . . Myelopathy can be cervical and thoracic; cervical myelopathy is the most prevalent.  Myelopathy is typically a gradual degenerative process affecting older adults." https://www.hopkinsmedicine.org/healthlibrary/conditions/nervous_system_disorders/myelopathy_22,myelopathy (last visited Feb. 21, 2019) (ellipsis supplied).

[42] *See*, *e.g.*, https://www.healthline.com/health/mixed-tension-migraine ("Scientists believe that there is a continuum of headaches, with tension headache at one end and migraine at the other. A mixed tension migraine is a headache that has characteristics of both a tension headache and a migraine headache.") (last visited Feb. 21, 2019).

LaGanke recommended that plaintiff's primary care physician prescribe "CK,"[43] "aldolase,"[44] and "Consider Decadron."[45] *Id*. In addition, because plaintiff had never been subjected to a magnetic resonance imaging ("MRI") scan,[46] Dr. LaGanke ordered that one be performed of his cervical spine.

(a) **Cervical spine scan**. The scan occurred at the Heritage Diagnostic Center in Cullman, Alabama on Monday, October 11, 2010.[47] Dr. LaGanke's evaluation of the images were stated as follows:

HISTORY: Spinal stenosis.[48]

---

[43] "CK" is an acronym for both an enzyme called *creatine kinase*, and also a test to measure the amount of that enzyme in a person's blood. "CK is a type of protein. The muscle cells in your body need CK to function. Levels of CK can rise after a heart attack, skeletal muscle injury, strenuous exercise, or drinking too much alcohol, and from taking certain medicines or supplements. If this test shows that your CK levels are high, you may have muscle or heart damage. CK is made up of three enzyme forms. These are CK-MB, CK-MM, and CK-BB. CK-MB is the substance that rises if your heart muscle is damaged. CK-MM rises with other muscle damage. CK-BB is found mostly in the brain." https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID =167&ContentID=creatine_kinase_blood (last visited Feb. 18, 2019). The results of plaintiff's Oct. 8, 2010 CK test are recorded at doc. no. 25, page 852.

[44] "Aldolase is a protein (called an enzyme) that helps break down certain sugars to produce energy. It is found in high amounts in muscle tissue. A test can be done to measure the amount of aldolase in your blood." https://medlineplus.gov/ency/article/003566.htm (last visited Feb. 21, 2019).

[45] Decadron® is a brand name for *dexamethasone* that is prescribed for, *e.g.*, relieving inflammation in various parts of the body. "It is used specifically to decrease swelling (edema), associated with tumors of the spine and brain, and to treat eye inflammation." http://chemocare.com/chemotherapy/drug-info/decadron.aspx (last visited Feb. 21, 2019).

[46] *See* doc. no. 25, at 849 ("Last MRI: NEVER HAD ONE") (caps in original). See note 19, *supra* (defining "magnetic resonance imaging (MRI)").

[47] **NOTE WELL**: Unless otherwise stated, all MRI scans referenced in this opinion were performed at the Heritage Diagnostic Center.

[48] "Spinal stenosis" is a narrowing of the spaces between the vertebra in a person's spine, "which can put pressure on the nerves that travel through the spine. Spinal stenosis occurs most

21

TECHNIQUE: Sagittal and axial images[49] are obtained throughout the cervical spine without the administration of Gadolinium [*i.e.*, *an MRI contrast substance*[50]].

FINDINGS: On T2 weighted imaging,[51] there are two hyperintensive areas at the ventral [*i.e.*, *front*] portion of C2 which are felt to likely represent artifact. At C4-5, there is a mild central disc protrusion with thecal impingement[52] but no significant stenosis. At C5-6, there is a broad based central disc protrusion with no significant stenosis. At C6-7, there is a broad based central disc protrusion without significant stenosis. Opposite the C6 vertebral body, there is bilateral uncovertebral

---

often in the lower back and the neck." https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-symptoms-causes/syc-20352961 (last visited Feb. 18, 2019). *See also* DORLAND'S at 1770 (defining spinal stenosis as "a narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication [*i.e.*, *a common symptom of lumbar spinal stenosis, causing impingement or inflammation of the nerves emanating from the spinal cord*]. The condition may be either congenital or due to spinal degeneration.") (alteration supplied).

[49] In medical terminology, *sagittal* refers to a vertical plane passing through the standing body from front to back, while *axial* relates to the central part of the body, in the head and trunk as distinguished from the limbs. *See, e.g.*, https://medical-dictionary.thefreedictionary.com (last visited Feb. 20, 2019).

[50] *See, e.g.*, https://www.insideradiology.com.au/gadolinium-contrast-medium/ (last visited Feb. 21, 2019).

[51] "The most common MRI sequences are T1-weighted and T2-weighted scans. T1-weighted images are produced by using short TE and TR times. The contrast and brightness of the image are predominately determined by T1 properties of tissue. Conversely, T2-weighted images are produced by using longer TE and TR times. In these images, the contrast and brightness are predominately determined by the T2 properties of tissue." http://casemed.case.edu/clerkships/neurology/web%20neurorad/mri%20basics.htm (last visited Feb. 18, 2019). For definitions of TE and TR pulse sequences in MRIs, *see* http://mriquestions.com/tr-and-te.html (last visited Mar. 18, 2019).

[52] "The thecal sac is a part of human anatomy, and it covers a portion of the spine, enclosing cerebral-spinal fluid, surrounding the spinal cord to protect it. It goes on the spine all the way through the S1 to S3 spinal levels, moving with it as it flexes. * * * Thecal sac impingement is one of [several] serious medical conditions that can affect your spine and your mobility. Since its mission is to insulate and protect all the sensitive nerve tissue in the spine, its malfunctioning can affect not only your mobility, but also cause significant discomfort and pain." https://www.organic4green livings.com/what-is-thecal-sac-impingement-and-how-to-fix-it/ (alteration supplied) (last visited Mar. 18, 2019).

spurring.[53]

*Id*. at 853 (alterations and footnotes supplied).[54]  Based upon those findings, Dr.

LaGanke revised his diagnosis of plaintiff's condition, stating that he suffered from

"Mild to moderate multilevel degenerative cervical disc disease."  *Id*.[55]

   **2. January 7, 2011:** *neurological evaluation*.  Plaintiff was again examined

by Dr. LaGanke three months later, on Friday, January 7, 2011.  The record of that

examination noted that plaintiff had "been diagnosed with fibromyalgia since his last

visit."  *Id*. at 854.  Dr. LaGanke dictated the following notes at the conclusion of his

examination:

> HPI:  Mr. Wiley presents in F/U [*follow-up*] of his myelopathy and
> mixed headache disorder.  He states that he continues to hurt all over.
> *He has been diagnosed with fibromyalgia since his last visit.*  He was
> given Lortab[56] but stopped it after 4 days because it didn't seem to help.
> He continues to have periodic limb numbness that can last up to 5 hours

   [53] *See* https://www.medilexicon.com/dictionary/46472 (defining the term *uncovertebral joints* as "small synovial joints formed secondarily between the lateral lips (uncinate processes) of the superior surfaces of the bodies of the lower cervical vertebrae and the inferior surface of the superior vertebral body") (last visited Feb. 20, 2019).

   [54] *See also* doc. no. 25, at 1185 (same).

   [55] "Cervical degenerative disc disease is a common cause of neck pain and radiating arm pain. It develops when one or more of the cushioning discs in the cervical spine starts to break down due to wear and tear."  https://www.spine-health.com/conditions/degenerative-disc-disease/cervical-degenerative-disc-disease (last visited Feb. 20, 2019).

   [56] "Lortab" is one of several brand names for a drug containing a combination of *hydrocodone* (a narcotic analgesic agent for the treatment of moderate to moderately severe pain) and *acetaminophen* (an analgesic pain reliever) that is used to relieve pain that is sufficiently severe to require opioid treatment, and when other pain medications either do not work well or cannot be tolerated.  *See* https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral- route/description/drg-20074089 (last visited Mar. 25, 2019).

and some weakness.  He still hobbles because of pain.  He believes that he hurts more with weather changes.  Pt denies any diplopia, dysphagia, or dysarthria.  Pt denies any bowel or bladder dysfunction.  Since his last visit his muscle enzymes returned [to] normal *and his C-spine MRI scan revealed cervical stenosis*.  His headaches are stable.

Doc. no. 25, at 854 (alterations and emphasis supplied).  Dr. LaGanke's revised diagnostic impression was that plaintiff suffered from:  *fibromyalgia*;[57] cervical stenosis;[58] arthritis; and, a "Mixed headache disorder."  *Id*. at 855.  He recommended that plaintiff's primary care physician continue his previously-prescribed medications and start him on "Savella" to better manage the pain associated with fibromyalgia.[59]  *Id*.

3.  **October 25, 2011**:  *Rheumatology Consultation at Vanderbilt*.  Plaintiff's primary care physician, Dr. David A. Francis, referred plaintiff to Dr. Kevin J. Myers at the Vanderbilt University Medical Center in Nashville, Tennessee, for a rheumatology consultation and evaluation of his leg pain.  The examination occurred on Tuesday, October 25, 2011.  Plaintiff then was 42 years of age.  Dr. Myers dictated

---

[57] See note 21, *supra* (defining "fibromyalgia").

[58] Cervical stenosis, also called cervical spinal stenosis, "occurs when the neck's protective spinal canal narrows due to degenerative changes or trauma.  If the space within the spinal canal is reduced too much, neurologic deficits can result from spinal cord compression, a condition called myelopathy." https://www.spine-health.com/conditions/spinal-stenosis/cervical-stenosis-myelopathy (last visited Feb. 21, 2019).

[59] Savella® (generic name *milnacipran*) "is a selective serotonin and norepinephrine reuptake inhibitor (SNRI)" that was approved by the FDA in January 2009 "to help manage fibromyalgia in adults." https://www.webmd.com/fibromyalgia/guide/savella-for-fibromyalgia-treatment#1-2 (last visited Feb. 21, 2019).

the following notes for file:

Present illness:  Mr. Wiley has been in fair general health.  The current problem started about 8 years ago.  He was having pain in the low back, and his chiropractor told him that he had some arthritis in the spine.  A few years later, both legs started to swell and hurt persistently.  Support hose and lasix[60] were used, and he believes that restless legs syndrome might have been diagnosed.  The pain worsened if he was on his feet a lot, and also worsened if he was off his feet for long.  He largely took no medication for this.  By 2010, he would have days when he could not move anything from the neck down for a few minutes on arising.  This seemed to worsen, and in May 2010, he had a spell of bad chest pain.  MI [*myocardial infarction — a heart attack*[61]] was excluded, and he was eventually told that this was due to "arthritis."

He was sent to neurology to see if he might have MS [*Multiple Sclerosis*].  He states that bulging disks were noted in the neck, and it was suggested that these disks might be the source of his intermittent paralysis.  It is not clear what the brain MRI showed – likely nothing.

In January he fell due to loss of balance, and since then he walks with a cane.  He feels as though his "spine is being torn apart with a knife."  He takes toradol chronically,[62] and Ultram,[63] and a little hydrocodone.

---

[60] Lasix® (generic name *furosemide*) is a diuretic that is used "to reduce extra fluid in the body (edema) caused by conditions such as heart failure, liver disease, and kidney disease.  This can lessen symptoms such as shortness of breath and swelling in your arms, legs, and abdomen.  This drug is also used to treat high blood pressure. Lowering high blood pressure helps prevent strokes, heart attacks, and kidney problems."  https://www.webmd.com/drugs/2/drug-3776-8043/lasix-oral/furosemide-oral/details (last visited Mar. 20, 2019).

[61] "MI" is a commonly used abbreviation among physicians to indicate a "myocardial infarction, otherwise known as a heart attack. The term 'myocardial infarction' focuses on the heart muscle, which is called the myocardium, and the changes that occur in it due to the sudden deprivation of circulating blood." https://www.medicinenet.com/script/main/art.asp?articlekey=4370 (last visited Mar. 20, 2019).

[62] "Toradol" (generic name *ketorolac tromethamine*) is a brand name for a non-steroidal anti-inflammatory drug indicated for short-term management of moderately-severe, acute-pain that requires analgesia at the opioid level. *See, e.g.,* https://www.rxlist.com/toradol-drug.htm (last visited Mar. 19, 2019).  "Chronic" in medicine means lasting a long time.  "A chronic condition is one that lasts 3 months or more.  Chronic diseases are in contrast to those that are acute (abrupt, sharp, and

He was told a few years ago that he might have Fibromyalgia. Savella was tried, and helped, but he could not urinate while on it. He was then given Cymbalta[64] (in combination with Savella), and got hives.

He is very inactive – he does some walking at work, but with a cane. His right leg is numb off and on. He does continue to go to a chiropractor.

A few years ago he was traveling, and had to do a lot of walking at Disneyland. He feels that the problem started then.

He has a lot of nausea in recent months, and just had endoscopy for this. His appetite is good, and weight stable.
He has not had trouble with infections in the past year.

*Id*. at 932 (footnotes and alterations supplied).

Dr. Myers dictated the following opinions following a physical examination,

X-Rays, laboratory tests, and review of plaintiff's past medical records:

Assessment and Plan: Mr. Wiley presents with severe pain through the upper and lower back, with spells of weakness. His examination is fairly normal other than revealing tenderness. His laboratory studies are also normal. I do not think that he has any form of primary rheumatologic disorder. I cannot address the question of multiple sclerosis here, but it is obvious that his syndrome would be quite

---

brief) or subacute (within the interval between acute and chronic)." https://www.medicinenet.com/script/main/art.asp?articlekey=2728 (last visited April 26, 2019).

[63] Ultram® (generic name *tramadol hydrocholoride*) is one of several brand names for an opioid analgesic used for the management of moderate to moderately severe pain in adults. *See*, *e.g.*, https://www.rxlist.com/ultram-drug.htm#indications (last visited Feb. 18, 2019).

[64] Cymbalta® is the brand name for a drug (generic name *duloxetine*) "used to treat depression and anxiety. In addition, *duloxetine* is used to help relieve nerve pain (peripheral neuropathy) in patients with diabetes or ongoing pain due to medical conditions such as arthritis, chronic back pain, or fibromyalgia (a condition that causes widespread pain)." https://www.webmd.com/drugs/2/drug-91491/cymbalta-oral/details (last visited Feb. 18, 2019).

atypical for it, and discussion with him suggests that an MRI of the brain was entirely normal. He does have follow up on this issue.

*I think it is far more likely that his problem is in the category of fibromyalgia. Fibromyalgia would often give rise to diffuse severe upper and lower back pain, which cannot be explained through the finding of disk abnormalities on MRI scans.*

He did considerably better while on treatment with Savella. It is possible that a different form of agent directed at anxiety would be helpful to him, without causing the same urinary side effect. I suggested a trial of zoloft at 50 mg daily.[65]

I would consider raising the doses if he tolerates the drug well.

I do not think that Toradol is the best agent for chronic use, particularly in an individual who is having significant gastrointestinal problems. He should try changing to an anti-inflammatory that causes less gastrointestinal upset.

He will switch to relafen,[66] 1000 mg daily, and decide after a week or two if this is similarly effective for pain control.
I do think that he should make an effort to exercise some.
I do not have any major form of treatment to recommend other than this.
He is going to continue follow-up with his primary care provider, and I will be available to him on an as needed basis.

*Id*. at 933-34 (emphasis and footnotes supplied).

**4. March 30, 2012:** *neurological evaluation and MRI scans*. The next

---

[65] Zoloft® is the brand name (generic name *sertraline*) for a drug used to treat depression, obsessive-compulsive disorder (OCD), posttraumatic stress disorder (PTSD), premenstrual dysphoric disorder (PMDD), social anxiety disorder, and panic disorder. *See* https://www.zoloft.com/ (last visited Mar. 20, 2019).

[66] Relafen® is the brand name (generic name *nonsteroidal* ) for an anti-inflamatory drug used to treat pain and arthritis. *See* https://www.webmd.com/drugs/2/drug-7004/relafen-oral/details (last visited Mar. 20, 2019).

neurological examination by Dr. LaGanke occurred on Friday, March 30, 2012. His report of that evaluation states:

> HPI: Mr. Wiley presents *in follow up of his fibromyalgia* and arthritis. He states that he still has muscle aches which have been worse in the cold weather. He has had bilateral lower extremity muscle spasms that were acutely worse in-between Thanksgiving and Christmas for two weeks and two other periods of time since his last visit. He has occasional urinary incontinence. He states that his headaches have been fairly well controlled except for periodic migraines. *He was unable to tolerate the Savella or the Cymbalta for his fibromyalgia*. He states that his headache was worse after he applied the last Butrans patch.[67] He has been to a rheumatologist at Vanderbilt and was told that he had no active rheumatoid arthritis. He denies any diplopia, dysphagia or dysarthria.

*Id*. at 856 (emphasis and footnote supplied).[68] Dr. LaGanke revised his opinion of plaintiff's conditions and diagnosed him as suffering from "myelopathy/ demyelinating disease," migraine headaches, and fibromyalgia. Doc. no. 25, at 858. *Myelopathy* is a "general term for a disorder in which the tissue of the spinal cord is compressed and this leads to spinal cord dysfunction."[69] A *demyelinating disease* is any condition that results in damage to the protective covering ("myelin sheath") that

---

[67] Butrans® (generic name *buprenorphine*) is a strong, extended-release, opioid pain medicine that "is used to manage pain severe enough to require daily, around-the-clock, long-term treatment with an opioid, when other pain treatments, such as non-opioid pain medicines (*e.g.*, acetaminophen, ibuprofen, or celecoxib) or immediate-release opioid medicines, do not treat your pain well enough, you experience side effects when taking them, or they are deemed otherwise inadequate." https://butrans.com/patient/what-is-butrans.html (last visited Feb. 18, 2019). A "Butrans patch" is a transdermal means of delivering the drug. *Id*.

[68] *See also* doc. no. 25, at 1188 (same).

[69] https://www.spine-health.com/glossary/myelopathy (last visited Feb. 18, 2019).

surrounds nerve fibers in a person's spinal cord.[70]  When the *myelin sheath* is damaged, nerve impulses slow or even stop, causing neurological problems.

> Multiple sclerosis (MS) is the most common demyelinating disease of the central nervous system.  In this disorder, [a patient's] immune system attacks the myelin sheath or the cells that produce and maintain it.  This causes inflammation and injury to the sheath and ultimately to the nerve fibers that it surrounds.  The process can result in multiple areas of scarring (sclerosis).[71]

Dr. LaGanke increased plaintiff's prescription for "Butrans" to 10 mcg (*i.e.*, micrograms),[72] and recommended that he submit to MRI scans of his cranium (brain) and cervical and thoracic spines.  *Id*.  The MRI scans were performed later that same day, and the radiological evaluation of each was recorded as follows.

**(a)  Brain scan**

HISTORY:  Demyelinating disease.

TECHNIQUE:   Sagittal, axial and coronal images[73] are obtained

---

[70] See note 15, *supra* (defining demyelinating disease").

[71] *Id*.

[72] "One microgram is one millionth of a gram and one thousandth of a milligram. It is usually abbreviated as mcg or ug."  https://www.viridian-nutrition.com/blog/nutrition-news-and-views/ (last visited Feb. 21, 2019).

[73] An MRI scan "provides exquisite detail of brain, spinal cord and vascular anatomy, and has the advantage of being able to visualize anatomy *in all three planes:  axial, sagittal and coronal*."   http://casemed.case.edu/clerkships/neurology/web%20neurorad/mri%20basics.htm (emphasis supplied) (last visited Feb. 21, 2019).

> *The sagittal or lateral plane* divides the body into left and right halves and is an x-z plane.  Technically, the sagittal or median plane goes right through the middle between the body's left and right halves.  Planes parallel to the sagittal planes are called parasagittal planes.  It is called the sagittal plane because it goes through or is

throughout the cerebrum without the administration of Gadolinium.

FINDINGS: On FLAIR imaging,[74] there are a couple of deep subcortical frontal hyperintense lesions in the superior portion. On T1 weighted imaging, there are no abnormal hypointense lesions. Within the inferior portion of the maxillary sinus cavity there is an increased signal on FLAIR imaging as there is mucoperiosteal thickening in the ethmoidal and frontal sinus cavities. On diffusion weighted imaging, there are no abnormal areas of restricted diffusion. The craniocervical junction is normal.

IMPRESSION:

1.     Scant areas of cerebral white matter change[75] most consistent

---

parallel to the sagittal suture, the line running along the top of the skull that marks where the left and right halves of the skull grew together.

*The coronal or frontal planes* divide the body into front and back (also called dorsal and ventral or posterior and anterior) sections and are x-y planes.

*The transvers planes*, also known as the axial or horizontal planes, are parallel to the ground and divide the body into top and bottom parts. The top and bottom sections also called the superior and inferior sections or the cranial (head) and caudal (tial) sections). They are x-z planes.

https://www.machinedesign.com/medical/what-s-difference-between-sagittal-coronal-and-transverse-planes (emphasis supplied) (last visited Mar. 18, 2019).

[74] FLAIR is an acronym for "Fluid-Attenuated Inversion Recovery." It is an MRI sequence used in brain imaging to suppress cerebrospinal fluid (CSF) effects on the image, in order to bring out periventricular hyperintense lesions, such as multiple sclerosis (MS) plaques. *See*, *e.g.*, http://casemed.case.edu/clerkships/neurology/web%20neurorad/mri%20basics.htm (last visited Feb. 21, 2019).

[75] "White matter disease is the wearing away of tissue in the largest and deepest part of your brain due to aging. This tissue contains millions of nerve fibers, or axons, that connect other parts of the brain and spinal cord and signal your nerves to talk to one another. A fatty material called myelin protects the fibers and gives white matter its color. This type of brain tissue helps you think fast, walk straight, and keeps you from falling. When it becomes diseased, the myelin breaks down. The signals that help you do these things can't get through. Your body stops working like it should, much like a kink in a garden hose makes the water that comes out go awry." https://www.webmd.com/brain/white-matter-disease#1 (last visited Feb. 21, 2019).

with microangiopathic change.[76]

2.    Mild sinus inflammatory disease.

*Id*. at 859 (footnotes supplied).[77]

**(b) Cervical spine scan**—

HISTORY:  Myelopathy.

TECHNIQUE:   Sagittal, axial images are obtained throughout the cervical spine prior to and after the administration of gadolinium.

FINDINGS:   At C4-5, there is a central disc profusion with thecal impingement but no significant stenosis.  There is mild bilateral neural foraminal narrowing[78] at this level.  At C5-6, there is a broad-based central disc protrusion with annular tear but no significant stenosis.  At C6-7, there is a minimal central disc protrusion without significant stenosis.  There is left facet arthropathy[79] at this level and mild left neural foraminal narrowing.  The intrinsic qualities of the cervical spinal

---

[76] "Microangiopathic change" refers to a disease of the small blood vessels.  There may be a connection between microanmgiopathic white matter change and Alzheimer's Disease. *See*, *e.g.*, https://www.ncbi.nlm.nih.gov/pubmed/22301385 (last visited Feb. 21, 2019).

[77] *See also* doc. no. 25, at 1191 (same).

[78] "Neural foraminal stenosis, *or neural foraminal narrowing*, is a type of spinal stenosis. It occurs when the small openings between the bones in [the] spine, called the neural foramina, narrow or tighten.  The nerve roots that exit the spinal column through the neural foramina may become compressed, leading to pain, numbness, or weakness." https://www.healthline.com/health/neural-foraminal-stenosis (alteration and emphasis supplied) (last visited Feb. 21, 2019).

[79] "Left facet arthropathy" is defined by https://www.disnola.com/what-is-facet-arthropathy/ as follows:

The facet joints connect the vertebral bodies to one another, and like the hip and the knee, they can also become arthritic and painful, and can be a source of back pain. The facet joints are located at the back of the spine and counterbalance the intervertebral discs. They help keep the normal alignment of the spinal vertebrae and limit motion. The pain and discomfort that is caused by degeneration and arthritis of this part of the spine is called *facet arthropathy*, which simply means a disease or abnormality of the facet joints.  [Emphasis supplied (last visited Feb. 21, 2019).]

31

cord appear normal.  The craniocervical junction[80] is normal.

IMPRESSION:  Mild cervical degenerative disc disease.[81]

*Id*. at 860 (footnotes supplied).

**(c) Thoracic spine scan**—

HISTORY:  Myelopathy.

TECHNIQUE:  Sagittal and axial images are obtained throughout the thoracic spine without the administration of gadolinium.

FINDINGS:  At T3-4, there is a mild central disc protrusion.  From T4-6, there is a central area of increased signal on T2 weighted imaging consistent with a syrinx.  This is quite small in size but does appear to be different than a remnant notochord.[82]

IMPRESSION:

1.    Apparent small thoracic syrinx[83] from T4-5.

_____

[80] "Craniocervical junction" refers to a "complex region where the skull and upper cervical spine connect.  The connection between the brain and the spinal cord is at the base of the brainstem in the region of the Craniocervical junction.  The base of the skull forms joints with the Atlas (C1, First cervical vertebral body) and the Axis (C2, Second cervical vertebral body) at the Occipital-C1 articulation & the C1-C2 articulation."  https://www.augustahealth.org/spine/spine-glossary/spine-glossary-craniocervical-junction (last visited Feb. 21, 2019).

[81] *See also* doc. no. 25, at 1192 (same).

[82] A "notochord" is a flexible, rodlike structure of cells that forms the principal longitudinal structural element of early human embryos, in which it plays an organizational role in the development of the nervous system.  In later vertebrate development, it becomes part of the vertebral column.  *See* https://www.britannica.com/science/notochord.  "In humans, most notochordal cells are eventually sequestered into the nucleus pulposus and disappear within the first decade of life.  Although *notochordal remnants* and related lesions have been described in the axial skeleton of adults, their presence in intervertebral disks is rare."  https://www.ncbi.nlm.nih.gov/pubmed/18545146 (emphasis supplied) (both websites last visited Feb. 21, 2019).

[83] A syrinx is an abnormal "fluid-filled cavity within the spinal cord (syringomyelia) or brain stem (syringobulbia).  * * *  Diagnosis is by MRI.  Treatment includes correction of the cause and surgical procedures to drain the syrinx or otherwise open CSF flow."

2.    Mild thoracic degenerative disc disease.

*Id*. at 861.[84]

**5.    August 17, 2012:** *neurological evaluation*.    Dr. LaGanke's next

neurological evaluation of plaintiff occurred four-and-a-half months later, on Friday,

August 17, 2012.  He dictated the following notes following his examination:

> HPI:    Mr. Wiley presents in *follow up of his fibromyalgia and
> demyelinating disease*.  He states that his balance continues to be off.
> He stumbles alot [*sic*] but has not fallen.  He had jaw surgery in June
> and developed a secondary infection and his immune system became
> weakened.  He had numerous upper respiratory infections.  He has taken
> alot [*sic*] of antibiotics since his last visit.  He states that his migraines
> have improved.  His emotions vary to not being able to control them to
> not having any crying outbursts.  He has had a thoracic MRI scan which
> revealed a syrinx.  He denies any diplopia, dysphagia or dysarthria.

*Id*. at 862 (emphasis and alterations supplied).[85]  Dr. LaGanke again revised his

diagnosis of plaintiff's conditions following this examination, and recorded that he

suffered  from:    frequent  infections;  periodic  PSA;[86]  *fibromyalgia*;  migraine

---

https://www.merckmanuals.com/professional/neurologic-disorders/spinal-cord-disorders/syrinx-of-the-spinal-cord-or-brain-stem (last visited Feb. 21, 2019).  *See also* DORLAND'S at 1858 (A syrinx is "an abnormal cavity in the spinal cord.").

[84] *See also* doc. no. 25, at 1193 (same).

[85] *See also id*. at 1946 (same).

[86] The letters "PSA" normally refer to *prostate specific antigen*:  "a substance produced by the prostate gland.  Elevated PSA levels may indicate prostate cancer, a noncancerous condition such as prostatitis, or an enlarged prostate."  https://www.webmd.com/prostate-cancer/guide/psa#1 (last visited Feb. 21, 2019).  "A periodic PSA determination is used to detect disease recurrence after treatment."  https://www.medicinenet.com/prostate_specific_antigen/article.htm#what_are_the_limitations_of_the_psa_test (last visited Mar. 18, 2019).  That said, this court does not understand what Dr. LaGanke meant by use of the phrase "periodic PSA" in this instance.

headaches; *demyelineating disease*; and *syringomyelia of the thoracic spine*. Doc. no. 25, at 864. *Syringomyelia* refers to the development of a fluid-filled cyst ("syrinx") within a person's spinal cord.[87] Over time, the cyst may enlarge, damaging the spinal cord and causing pain, weakness, and stiffness, among other symptoms.

> Syringomyelia has several possible causes, though the majority of cases are associated with a condition in which brain tissue protrudes into [a patient's] spinal canal (Chiari malformation). Other causes of syringomyelia include spinal cord tumors, spinal cord injuries and damage caused by inflammation around [a patient's] spinal cord.[88]

Dr. LaGanke recommended that plaintiff return in three months for a battery of thoracic and cranial MRI scans. *Id.*

**6. December 21, 2012 MRI scans and neurological evaluation**. Plaintiff's next neurological evaluation did not occur until four months later, however. Prior to his physical examination on Friday, December 21, 2012, plaintiff was subjected to two MRI scans. The radiological evaluation of each reads as follows:

**(a) Brain scan**

---

[87] *See*, *e.g.*, DORLAND'S at 1858 (defining syringomyelia as "a slowly progressive syndrome of cavitation in the central segments of the spinal cord, generally in the cervical region, but sometimes extending up into the medulla oblongata (*syringobulbia*) or down into the thoracic region; it may be of developmental origin, arise secondary to tumor, trauma, infarction, or hemorrhage, or be of unknown cause. It results in neurologic deficits, usually segmental muscular weakness and atrophy with a dissociated sensory loss (loss of pain and temperature sensation, with preservation of the sense of touch), and thoracic scoliosis is often present.").

[88] https://www.mayoclinic.org/diseases-conditions/syringomyelia/symptoms-causes/syc-2035 4771 (last visited Feb. 21, 2019) (alterations supplied).

HISTORY:  Demyelinating disease

TECHNIQUE:  Sagittal, axial and coronal images are obtained throughout the cerebrum without the administration of Gadolinium.

FINDINGS:  On FLAIR imaging, there are a few bilateral deep subcortical frontal white matter hyperintense lesions.  On T1 weighted imaging, there are no abnormal hypointense lesions.  In comparison with MRI scan from 3-30-12, there are no additional lesions noted.

IMPRESSION:
A few areas of white matter change most consistent with microangiopathy.[89]  Clinical correlation is recommended.  These findings are stable over the past 9 months.

*Id*. at 869 (footnote supplied).[90]

### (b)  Thoracic spine scan

HISTORY:  Thoracic syrinx

TECHNIQUE:  Sagittal and axial images are obtained throughout the thoracic spine with the administration of Gadolinium.

FINDINGS:  BetweenT4 and T7, there is a central area of increased signal on T2 weighted imaging.  A similar central area of increased signal is noted between T10 and T12.  The intervertebral disc space and vertebral bodies appear normal.

---

[89] *Microangiopathy* (or microvascular disease, or small vessel disease) is an angiopathy (*i.e.*, disease of the blood vessels) that affects the small blood vessels in the body.  *Microangiopathic white matter disease* increases the  risk of stroke and dementia.  Unlike Alzheimer's disease, however, which shrinks the hippocampus, causing progressive memory loss, white matter disease is a more diffuse mind-robbing condition that targets small blood vessels deep within the brain's white matter.  *See, e.g.*, https://www.sciencedaily.com/releases/2014/02/140224204806.htm (last visited Feb. 22, 2019).

[90] *See also* doc. no. 25, at 1201 (same).

IMPRESSION:
Probable stable thoracic syrinx versus central notochord.

*Id*. at 870.[91]

      **(c) Evaluation notes**.  Following his physical examination of plaintiff,

Dr. LaGanke dictated the following notes:

> HPI:  Mr. Wiley presents in follow up of his demyelinating disease and fibromyalgia.  *He states that since his last visit he was involved in a motor vehicle accident on 9/20/2012.  He states that numerous bones on the left side of his body were broken.  He had a crushed diaphragm and a collapsed lung*.[92]  With the pelvic fractures he has had more difficulty controlling his bladder.  He states that he is having more bladder loss with standing or sitting.  He has had more tremor.  His cranial MRI scan from earlier today was reviewed in the clinic and revealed no new or enhancing lesions.  He had a few stable white matter lesions.  His thoracic spine MRI scan revealed a probable thoracic syrinx versus notochord.

*Id*. at 866 (emphasis and footnote supplied).[93]  Dr. LaGanke's revised diagnoses of

plaintiff's conditions following this examination and review of the foregoing MRI

scans were recorded as follows: *fibromyalgia*; "S/P MVA" [*presumably*, *Status/Post*

*Motor Vehicle Accident*]; thoracic syrinx; and, *demyelinating disease*.  *Id*. at 867.  He

recommended that plaintiff continue his previously-prescribed medications and return

---

    [91] *See also id*. at 1202 (same).

    [92] A later medical report, dictated by Dr. LaGanke on February 16, 2015, states that plaintiff "Was in a 'near fatal' MVA 2 years ago hit on drivers side and pushed over to passenger seat–hit head on DVD deck and cleared it to passenger side.  Was hit by post on left side of car in the left side of head."  *Id*. at 389.

    [93] *See also id*. at 1986 (same).

for a follow-up examination in four months.  Doc. no. 25, at 867.

**7. April 26, 2013 neurological evaluation**.  Plaintiff reported as instructed for neurological evaluation four months later, on Friday, April 26, 2013.  The report dictated by Dr. LaGanke provided that:

> HPI:   Mr. Wiley presents in follow up of his *fibromyalgia* and *demyelinating disease*.  He states he still has not healed from the motor vehicle accident he had on 9/12.  He states he has permanent lung damage from the motor vehicle accident.  He is also going to have left shoulder surgery soon for a torn rotator cuff.  He has constant pain in the shoulder.  *His fibromyalgia pain is worse and definitely worse in the colder weather.  For the past couple of days the pain has been more intense*.  He states that he has intermittent left leg numbness and pain. He has had a couple of near syncopal episodes.  He states that his migraines have been well controlled.  He is tolerating his IVIG therapy [*i.e.*, *intravenous immunoglobulin* therapy] well though it usually induces headaches and pain for a couple of days after he completes the treatment.

*Id*. at 871 (emphasis supplied).[94]   Intravenous immunoglobulin ("IVIG") therapy assists patients with weakened immune systems or other diseases to fight off infections.[95]

Dr. LaGanke again revised his diagnoses of plaintiff's conditions as follows:

---

[94] *See also id*. at 1203 (same).

[95] "IVIG" (sometimes written as "IVIg") is an acronym for *intravenous immunoglobulin*:  a blood product prepared from the serum of 1,000 and 15,000 donors per batch.  It is the treatment of choice for patients with antibody deficiencies.  *See*, *e.g.*, https://www.uptodate.com/contents/ intravenous-immune-globulin-ivig-beyond-the-basics; and, https:///www.ncbi.nlm.nih.gov/pmc/ articles /PMC1809480/ (both last visited Mar. 26, 2019).

"729.1 FIBROMYALGIA was added";[96] "IgG deficiency";[97] and "Left shoulder

pain." *Id*. at 873. He recommended that plaintiff continue his IVIG therapy, take 10

mg of Decadron[98] when finishing his IVIG therapy, lower his dosage of Savella, and

return for a follow-up evaluation in four months. *Id*.

**B.    May 20, 2013:** *Plaintiff's first claim for short-term disability benefits*

Plaintiff lodged two claims for short-term disability benefits prior to the long-

term disability claim that is the subject of this appeal. The first was submitted on

May 20, 2013, and claimed benefits for injuries sustained in a work-related motor

vehicle accident that occurred on Thursday, September 20, 2012. *See id*. at 328

("Accident occurred 9/20/2012 while working for Jacobs Technology. Camber

Corporation took over contract in Dec. 2012. Doctors determined in Mar 2013 that

more surgery is required to fix damaged shoulder.").[99]

---

[96] Prior to October 1, 2015, when diagnosing patients with fibromyalgia, doctors had to use the general code "729.1 – Myalgia and myositis, unspecified." Any kind of muscle pain or inflammation could be included under that code, however. On October 1, 2015, however, fibromyalgia was recognized as a distinct entity with its own code: "M79.7 – Fibromyalgia." *See, e.g.*, https://www. prohealth.com/library/fibromyalgia-is-finally-recognized-as-an-official-diagnosis-37536 (last visited Feb. 24, 2019).

[97] See note 26, *supra* (defining "IgG deficiency").

[98] Decadron® is one of several brand names of a drug (generic name dexamethasone) used to treat conditions such as arthritis, blood/hormone/immune system disorders, allergic reactions, breathing problems, certain bowel disorders, and certain cancers. *See, e.g.*, https://www.webmd.com /drugs/2/drug-6748/decadron-oral/details (last visited Mar. 25, 2019).

[99] *See also* doc. no. 25, at 322 (same) and 332 (same). As noted previously, the December 21, 2012 report dictated by Dr. LaGanke observed that plaintiff "was involved in a motor vehicle accident on 9/20/2012," and that plaintiff stated "that numerous bones on the left side of his body were broken. He had a crushed diaphragm and a collapsed lung." *Id*. at 866. Moreover, the

Defendant denied that claim on June 4, 2013, stating as a reason for doing so that plaintiff had applied for and received workers' compensation benefits for the injuries to his left shoulder. *See id*. at 316-19. The policy language on which the denial was based provided that benefits would not be paid "for any Disability which . . . arises out of or in the course of employment with the Policyholder for which You are entitled to benefits under any workers' compensation or occupational disease law, or receives [*sic*] any settlement from the workers' compensation carrier . . . ." Doc. no. 25, at 20.

**C.    Medical Evaluations After April 26, 2013, But Before December 3, 2014**

**1. August 30, 2013:** *neurological evaluation*. As instructed, plaintiff returned to Dr. LaGanke's office four months after his previous visit, on Friday, August 30, 2013. He was not examined on that occasion by Dr. LaGanke, however, but by another physician in the professional corporation, Pamela Quinn, M.D.[100] Dr. Quinn dictated the following report of her evaluation:

HPI:  Mr. Wiley is here for follow up for *demyelinating disorder*,

---

February 16, 2015 report dictated by Dr. LaGanke (discussed *infra*) states that plaintiff "Was in a 'near fatal' MVA 2 years ago hit on drivers side and pushed over to passenger seat–hit head on DVD deck and cleared it to passenger side.  Was hit by post on left side of care in the left side of head." *Id.* at 389.

[100] *See id*. at 1417 (Statement from "North Central Neurology Associates, P.C." listing the following persons as members of the Professional Corporation:  "Christopher LaGanke, M.D.; *Pamela Quinn, M.D.*; and Kimberly Chaney, CRNP [*i.e.*, a Certified Registered Nurse Practitioner]" (emphasis and alteration supplied). *See also* https://www.northcentralneureology.com/ our-providers (listing biographical information for each physician) (last visited April 3, 2019).

migraines, *fibromyalgia* and weakness.
STATES, STOPPED SAVELLA, BLADDER WOULDN'T EMPTY.
STILL SOME PAIN FROM MVA.
*Ambulating with cane*.
Fibromyalgia was great until bladder would not empty.
Does not want to ever try lyrica.[101]
Cannot tolerate cymbalta – hives.
Taking ultram tid [*three times a day*].[102]
Taking toradol prn[103]
Has been taking tons of Tylenol – sometimes 6 extra strength Tylenol
in 4 hour span.
Last MRI:  12/2012

*Id*. at 874 (all caps in original, emphasis, alteration, and footnotes supplied).[104]  Dr.

Quinn issued a prescription for ninety 300 mg Neurontin capsules,[105] to be taken three

times a day (with the possibility of up to four refills), and instructed plaintiff to return

in two weeks when he was scheduled for another "infusion" (*presumably*, another

IVIG therapy).  *See id*. at 876.

   **2. September 13, 2013:** *neurological evaluation*.  Plaintiff was re-examined

by Dr. Quinn two weeks later, on Friday, September 13, 2013.  Her notes included the

---

[101] Lyrica® (generic name *pregabalin*) is a prescription medicine approved by the FDA to treat fibromyalgia, diabetic nerve pain, spinal cord injury nerve pain, and pain after shingles. *See*, *e.g.*, https://www. lyrica.com/ (last visited Feb. 18, 2019).

[102] "tid" — regardless of whether it is written as here, without periods, or as "t.i.d." — stands for the Latin term "ter in die," meaning "three times a day."  DORLAND'S at 1927.

[103] "PRN" — regardless of whether it is written, as here, "prn," or in all caps — is a Latin term "*pro re nata*," meaning "according to circumstances."  DORLAND'S at 1515.

[104] *See also* doc. no. 25, at 1206 (same).

[105] Neurontin® (generic name *gabapentin*) is "an anti-epileptic drug, also called an anticonvulsant.  It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain."  https://www.drugs.com/neurontin.html (last visited Feb. 24, 2019).

following information:

> HPI:  Mr. Wiley is here for follow up for demyelinating disease.
> The pain is the same as it was.
> Neurontin us [*sic*] helping.  Initially caused dizzines [*sic*].
> He initially missed a day of work because of the dizziness.
> He is now able to tolerate it tid.  He did notice some dizziness last night.
> Continues on tramadol.[106]
> He is getting an infusion today.
> HA [*presumably*, *headaches*] have been stable.
> STATES NEURONTIN NOT HELPING THE PAIN, CAUSING DIZZINESS AND NAUSEA.

*Id*. at 877 (alterations and footnote supplied, all caps in original).[107]  Dr. Quinn concluded her examination by directing plaintiff to increase his dosage of Neurontin to two 300 mg capsules three times each day, and to return for a follow-up examination in four weeks.  *See id*. at 879.

**3. October 11, 2013 neurological evaluation**.  Plaintiff reported as instructed four weeks later, on Friday, October 11, 2013, and Dr. Quinn dictated the following notes following her examination:

> HPI:  Mr. Wiley is here for revisit for HA [*headaches*], *Demyelination*, *Fibromyalgia*, muscle weakness and cervical myelopathy
> He says that he has had some falls recently.
> His legs just got weak and he sank to the floor.
> The dizziness has improved.
> He seems to be having increased numbness in his legs.

---

[106] As observed in note 63, *supra*, "*tramadol*" (or *tramadol hydrochloride*) is the generic term for an opioid analgesic marketed under several brand names, such as Ultram,® and used for the management of moderate to moderately severe pain in adults.

[107] *See also* doc. no. 25, at 1209 (same).

His feet feel cold to him but not to the touch.
Neurontin has helped with the pain.
STATES: FOLLOW UP. BILATERAL LEG NUMBNESS GETTING
WORSE. COLDNESS IN FEET. FELL AT WALMART TWO
WEEKS AGO.

*Id*. at 880 (alteration and emphasis supplied, all caps in original).[108]  Dr. Quinn

recommended: that plaintiff continue his IVIG therapy, his prescribed dosage of

Neurontin, and his use of a cane when walking; that Dr. LaGanke schedule additional

MRI scans of plaintiff's brain and lumbar spine; and, that plaintiff return for re-

evaluation following the MRI scans. Doc. no. 25, at 882.

**4. October 21, 2013 MRI scans**. The scans of plaintiff's brain and lumbar

spine recommended by Dr. Quinn were conducted ten days later, on Monday, October

21, 2013. The radiological reports read as follows.

**(a) Brain scan**

HISTORY: Demyelinating disease.

TECHNIQUE: Sagittal, axial and coronal images are obtained
throughout the cerebrum prior to the administration of Gadolinium.
Axial and coronal images are obtained after administration of
Gadolinium.

FINDINGS: On FLAIR imaging, there are a couple of 1 mm
hyperintense lesions in the deep subcortical frontal white matter. On T1
weighted imaging, there are no abnormal areas of hypointensity. After
the administration of Gadolinium, there are no abnormal areas of
enhancement. The craniocervical junction is normal. On diffusion

---

[108] *See also id.* at 1212 (same).

weighted imaging, there are no abnormal areas of restricted diffusion.

IMPRESSION:
Minimal microangiopathic change.

*Id*. at 884.[109]

### (b) Lumbar spine scan

HISTORY:  LS [*i.e.*, *lumbrosacral*] radiculopathy

TECHNIQUE:  Sagittal and axial images are obtained throughout the lumbar spine and without the administration of Gadolinium.

FINDINGS:  At L4-5, there is a disc protrusion eccentric to the left and bilateral facet arthropathy resulting in moderate bilateral neural foraminal narrowing.  At L5-S1, there is a left sided disc protrusion with moderate left neural foraminal narrowing.  Within each lumbar vertebral body and the sacral bodies there are hyperintense circular areas on both T1 and T2 weighted imaging consistent with hemanglomata.  After the administration of Gadolinium, there are no abnormal areas of enhancement.

IMPRESSION:
1. Lumbosacral degenerative disc disease most prominent at L4-5 and L5-S1.
2. Multiple vertebral body hemanglomata.

*Id*. at 883 (alteration supplied).[110]

**5.  November 22, 2013:**  *neurological evaluation*.  The next neurological evaluation occurred on this date, one month after the foregoing MRI scans of plaintiff's brain and lumbar spine.  The examination was again conducted by Dr.

---

[109] *See also id*. at 1216 (same).

[110] *See also id*. at 1215 (same).

Quinn, who dictated the following notes for plaintiff's records.

> HPI: Mr. Wiley is here for follow up for back pain and demyelination.
> He is still having lots of back pain.
> Continues having bladder issues.
> His MRI of the lumbar spine showed some bugling [*sic*] disc.
> He was not stable [*sic*] to start PT because of his insurance.
> He is doing decompression at the chiropractor.
> BP [*i.e.*, *blood pressure*] is elevated today.
> MRI of the brain stable.
> Fibromyalgia stable.
> HA stable.
> Taking tramadol prn [*i.e.*, *as needed for*] pain. Continues on gabapentin.[111]
> STATES, HAVING SOME INCONTINENCE OF URINE, WORSE OVER THE LAST 2-3 WEEKS AND SINCE THE CAR ACCIDENT, NEURONTIN NOT HELPING. WAS TAKEN OFF METROPROLOL PER WORKMANS COMP, AND BLOOD PRESSURES HAVE SHOT UP.

*Id*. at 886 (footnotes supplied, all caps in original).[112] Dr. Quinn increased plaintiff's prescribed dosage of Neurontin to 600 mg capsules four times daily; continued his prescription for tramadol (Ultram®); recommended that he resume use of Metoprolol;[113] consult his primary care physician about bladder issues; and return for a follow-up neurological examination in twelve weeks. *Id*. at 888.

**6. February 14, 2014:** *neurological evaluation*. Plaintiff returned for his

---

[111] As observed in note 105, *supra*, *gabapentin* is the generic name of a drug marketed under the brand name of, among others, Neurontin.®

[112] *See also* doc. no. 25, at 1218 (same).

[113] Metoprolol is a "Beta Blocker" commonly marketed under the brand names of Lopressor and Toprol XL, and used to treat high blood pressure, chest pain (angina), and heart failure. *See* https://www.medicalnewstoday.com/articles/324023.php (last visited Mar. 19, 2019).

follow-up neurological evaluation precisely twelve weeks later, on Friday, February 14, 2014. He was again examined by Dr. Quinn, who dictated the following notes for his medical records.

> HPI: Mr. Wiley is here for follow up.
> Still having lots of back pain.
> He got some ultram from his family doctor which helps a bit.
> His BP is stable.
> Fibromyalgia stable.
> HA stable.

*Id*. at 889.[114] Dr. Quinn's notes reflect that she scheduled plaintiff for an epidural injection and ordered a "DDS-500 belt for him." Doc. no. 25, at 891. A DDS-500 spinal decompression belt is a "Spinal-Air Decompression Brace LSO [*i.e.*, *lumbar sacral orthosis*] with Anterior and Posterior Rigid Panels" that is designed (according to the manufacturer of the patented technology) to decrease

> axial loading while increasing intervertebral disc space by anchoring underneath the rib cage pushing upwards and against the pelvic girdle pushing downwards. This action gently stretches the torso vertically and displaces stress away from the affected disc and nerve. Pressure and pain levels, within the lumbar spine region, is significantly reduced which can assist active-rehabilitation.[115]

**7. February 21, 2014 examination by primary care physician**. Dr. David Francis dictated the following notes at the conclusion of his February 21, 2014

---

[114] *See also* doc. no. 25, at 1221 (same).

[115] https://discdisease solutions.com/products/dds-500-back-brace/ (last visited Mar. 19, 2019).

examination of plaintiff:

> **Complaint**:
> Mr. Wiley is here for his health maintenance visit.
> Patient is here for follow up of *hyperlipidemia*. Condition is well controlled with treatment regimen. He is currently asymptomatic.
> He is here for follow up of *gastroesophageal reflux disease*. He denies dyspepsia or dysphagia and says symptoms controlled with current treatment regimen.
> Patient is here for follow up of *chronic back pain*. The condition is reported as controlled on current medical regimen and no progression or worsening of the same. In with Dr. Leganke [*sic*] still and looking at eipdurals [*sic*] in next month. *Still contemplating surgery for same*.
> Patient is here for follow up of a *migraine headache*. Condition is well controlled with treatment regimen. He is currently asymptomatic.
> He is in today for follow up of *pre-diabetes*. He states that condition is well controlled with current treatment regimen. At present, he is asymptomatic.

*Id*. at 1383 (emphasis and alterations supplied).

> **8. April 11, 2014 neurological evaluation**. Plaintiff returned to the office of

Dr. LaGanke on Friday, April 11, 2014, and was again examined by Dr. Quinn. She

dictated the following entries for his records.

> HPI:   Mr. Wiley is here for follow up for *demylinating disease*, *fibromyalgia*, and headache.
> He is getting infusion today
> He is not feeling well.
> *Lots of fibromyalgia pain*.
> *Pos back pain*. He *"feels like a knife is stuck in his back"*.
> He is getting epidurals.
> He got the DDS belt and it helps a little.
> Denies diplopia, dysarthria and dysphagia.
> No bowel or bladder issues.

HA [*presumably, headaches*] are stable.

He is not sleeping well even with lunesta[116]

HX [*i.e.*, medical history[117]] FIBROMYALGIA, HEADACHE, DEMYELINATING DISEASE.

*Id*. at 892 (emphasis, alterations, and footnotes supplied, all caps in original).[118]

**9. July 3, 2014:** *neurological evaluation*. Plaintiff returned to the office of Dr. LaGanke on Thursday, July 3, 2014, and was examined by him. The following notes were dictated for plaintiff's file:

HPI: Mr. Wiley presents in follow up of his demyelinating disease and IgG deficiency. He states that overall he has been doing fairly well. He has had no respiratory infections since starting his IVIG. He did have a prostate infection since his last visit. He required four weeks of antibiotics. He states that he tolerates the IVIG much better now. He has 2-3 days of ill feeling after the IVIG as opposed to a week since the institution of Decadron. He states that about 12 hours after his IVIG he will start sneezing for 6-12 hours and be unable to sleep. He will then feel hungover for a day or so and then return to his normal baseline state. He continues to have chest pain from his motor vehicle accident and notices that if he talks too long he starts to lose his wind. He has two disc protrusions in the low back which causes [*sic*] him severe pain from time to time. When he has a twinge of pain he will have some loss of urine for a couple of seconds. He wears a pad now frequently. He states that the tingling in his feet is better on the IVIG, as the day goes on the tingling in his toes will migrate up the leg somewhat but has not progressed any since going on the IVIG. He denies any diplopia, dysphagia or dysarthia. He denies any bowel or bladder dysfunction.

---

[116] Lunesta® (generic name *eszopiclone*) is a nonbenzodiazepine hypnotic agent that is prescribed for the treatment of insomnia. *See*, *e.g.*, https://www.rxlist.com/lunesta-drug.htm#description (last visited Mar. 19, 2019).

[117] "Hx" (or, as here, "HX") stands for medical history. *See*, *e.g.*, https://medical-dictionary.thefreedictionary.com/Hx (last visited Mar. 19, 2019).

[118] *See also* doc. no. 25, at 1224 (same).

He states that his migraines are doing well as long as he stays away from MSG [*i.e., Monosodium Glutamate*].

*Id*. at 1227 (alterations supplied).

**10. August 22, 2014:** *examination by primary care physician*.  Dr. David

Francis dictated the following notes after his August 22, 2014 examination:

> **Complaint**:
> Mr. Wiley is here for his health maintenance visit.
> Patient is here for follow up of *hyperlipidemia*.[119]  Condition is well controlled with treatment regimen.  He is currently asymptomatic.
> He is here for follow up of *gastroesophageal reflux disease*.  He denies dyspepsia or dysphagia and says symptoms controlled with current treatment regimen.  Patient is here for follow up of *irritable bowel syndrome*.  Condition is well controlled with treatment regimen.  He is currently asymptomatic.
> Patient is here for follow up of *chronic back pain*.  The condition is reported as controlled on current medical regimen and no progression or worsening of the same.  *Dr. Leganke* [*sic*] *still not at diagnosis but leaning toward MS* [*Multiple Sclerosis*].  His opinion is wreck made worse.
> Patient is here for follow up of a *migraine headache*.  Condition is well controlled with treatment regimen.  He is currently asymptomatic.
> He is in today for follow up of *pre-diabetes*.  He states that condition is well controlled with current treatment regimen.  At present, he is asymptomatic.

*Id*. at 1379 (emphasis, footnote, and alteration supplied).

**11. October 20, 2014 neurological evaluation and MRI scan**.  Dr. LaGanke

---

[119] *Hyperlipidemia* indicates that a patient's blood contains too many lipids (or fats), such as cholesterol and triglycerides. *See, e.g.,* https://www.heart.org/en/health-topics/cholesterol/prevention-and-treatment-of-high-cholesterol-hyperlipidemia (last visited Mar. 23, 2019). *See also* DORLAND'S at 108 (defining hyperlipidemia as "a general term for elevated concentrations of any or all of the lipids in the plasma, such as hypertriglyceridemia, hypercholesterolemia, and so on").

dictated the following notes following his examination of plaintiff on Monday, October 20, 2014:

> HPI:  Mr. Wiley presents in *follow up of his demyelinating disease and fibromyalgia*.  He states that he has had near constant numbness and tingling with a cold sensation from his waist down to his feet.  His legs give out from under him at times.  He states that he is uncoordinated with his hands and will drop objects.  He has been stumbling more but has not fallen more than a couple of times.  He has had numbness in his upper extremities intermittently as well.  He states that his left face has had some drawing.  It will draw intermittently over a 30-45 minute period of time.  He has sporadic dizzy episodes that can occur when he is walking.  He has to brace himself until it passes within seconds to a minute.  He has had more bilateral blurry vision.  His short term memory has been worse.  His overall function is worse in the heat.  He did get a cooling vest which helped.  His migraines have increased in frequency mildly.  He denies any diplopia, dysphagia or dysarthria.

*Id*. at 1230 (emphasis supplied).  Dr. LaGanke recommended an additional MRI scan.

*See* doc. no. 25 at 1232 ("Review MRI when available.").

      **(a) Brain scan**.  The scan of plaintiff's brain was performed later that same day and resulted in the following report:

HISTORY:  Demyelinating disease.

TECHNIQUE:   Sagittal, axial and coronal images are obtained throughout the cerebrum prior to the administration of Gadolinium.  Axial and coronal images are obtained after administration of Gadolinium.

FINDINGS:  On FLAIR imaging, there are a couple of bilateral deep subcortical hyperintense lesions measuring less than 3 mm in size.  On T1 weighted imaging, there are no abnormal areas of restricted

diffusion.  After the administration of Gadolinium, there are no abnormal areas of enhancement.  There is some mild increased signal within the ethmoidal[120] and frontal sinus cavities.  There is moderate generalized atrophy for age.

IMPRESSION:

1.  Minimal white matter change most consistent with microangiopathy.
2.  Mild sinus inflammatory disease.
3.  Generalized atrophy.

*Id*. at 1234 (footnote supplied).

**D.  December 3, 2014:** *plaintiff's second claim for short-term disability benefits*

Plaintiff's second claim for short-term disability benefits was filed a year-and-a-half after the first, and sought benefits from December 8, 2014:  the date on which plaintiff's claim form stated that he intended to begin his absence from work due to "degenerative arthritis of the spine, bulging/herniated discs, stenosis, and bone spurs [*that*] began approx [*sic*] 2003-2004 and [*which*] has progressively worsened since." *Id*. at 274 (alterations supplied).  Plaintiff's claim was quickly approved by defendant in a December 12, 2014 letter reading, in pertinent part, as follows:

Dear Mr. Wiley,

---

[120] "The ethmoid sinus or ethmoidal air cells of the ethmoid bone is one of the four paired paranasal sinuses.  The cells are variable in both size and number in the lateral mass of each of the ethmoid bones and cannot be palpated during an extraoral examination.  They are divided into anterior and posterior groups.  The ethmoidal air cells are numerous thin-walled cavities situated in the ethmoidal labyrinth and completed by the frontal, maxilla, lacrimal, sphenoidal, and palatine bones. They lie between the upper parts of the nasal cavities and the orbits, and are separated from these cavities by thin bony lamellae." https://en.wikipedia.org/wiki/Nasal_cavity (last visited Mar. 21, 2019).

We have received your application for Short Term Disability benefits beginning December 09, 2014.

Your policy provides Short Term Disability benefits when a sickness or injury prevents you from performing all of the Material Duties of your Regular Job. The benefit determination is based upon policy provisions, the medical information provided by your treating medical professional and standard medical guidelines for disability duration.

Benefits become payable once you have satisfied your policy's elimination period. An elimination period is a specified amount of time beginning with the onset of your disability in which no benefits are payable. Your elimination period started on December 09, 2014, and was satisfied as of December 23, 2014. Therefore, benefits will begin on December 23, 2014.

According to the prognosis provided by your physician, you have been given a return to work date of March 04, 2015. Your benefits are approved to that date [*i.e., for seventy-one days — the aggregate of eight days from December 23–31, 2014;* plus *thirty-one days in January 2015;* plus *twenty-eight days in February 2015;* plus *four days in March 2015 — a total that is six days less than the seventy-seven days* ("11 weeks") *of maximum benefits payable under defendant's short-term disability policy* [121]].

If you return to work prior to March 04, 2015, please notify our office immediately to avoid an overpayment of benefits on your claim.

* * * *

*Id.* at 265-66 (alteration, footnote, and ellipsis supplied).

## E.    December 2014 Surgical Procedures

---

[121] *See* doc. no. 25, at 13 ("Schedule" for Short-Terms Disability Benefit Policy No. GUG-AMTZ, listing "11 weeks" as the "Maximum Benefit Period").

Plaintiff was examined at the Laser Spine Institute in Tampa, Florida, on December 8, 2014: *i.e.*, the date on which the preceding claim for short-term disability benefits stated that plaintiff intended to begin his absence from work. He was subjected to an extensive battery of tests, including X-Rays, MRI scans, and CT ("Computerized Tomography"[122]) scans of his spinal column. The initial document from plaintiff's Laser Spine Institute file described his chief complaints and the symptoms that caused him to seek surgical intervention as follows:

> *HPI Notes:* Patient is a 45 y/o male who presents for surgical evaluation of [*the*] lumbar and cervical spine. States that he has [*not*] had prior spine surgery but has had conservative therapy for [*the*] neck and the [*Low Back*] with no relief of the pain. States that he has had neck pain for about 9 years and [*Low Back Pain*] for about 11 years and both are worse in the past 6 months. States that he had severe MVA [*i.e.*, *Motor Vehicle Accident*] but that was not the initial cause of the pain[;] it only made the pain worse. States that the pain does adverslya [sic] affect his ADLs [i.e., *Activities of Daily Living*] and uses cane to ambulate because of the weakness. States that the neck pain radiates into the shoulders and scapula down the tricep into the hands with N/T [*presumably*, *No Tingling*], weakness and burning. States that the [*Low Back Pain*] radiates into the buttocks and hips (occasionally into the groin) into the

---

[122] A computerized tomography ("CT") scan "combines a series of X-ray images taken from different angles around your body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside your body. CT scan images provide more-detailed information than plain X-rays do." https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675 (last visited Feb. 18, 2019). Stated differently, tomography is "the recording of internal body images at a predetermined plane by means of the tomograph." DORLAND'S at 1935. The tomograph is "an apparatus for moving an x-ray source in one direction as the film is moved in the opposite direction, thus showing in detail a predetermined plane of tissue while blurring or eliminating detail in other planes." *Id.* Computed tomography is "tomography in which the emergent x-ray beam is measured by a scintillation counter; the electronic impulses are recorded digitally and then are processed by a computer for reconstruction display." *Id.*

> posteriolateral [*sic*] leg and calf into the feet with burning, weakness and
> N/T [*sic*].

*Id*. at 282 (alterations supplied).[123]

    **1. December 9th evaluation**. Dr. William Oliver Reed interpreted the admitting examination findings and met with plaintiff on Tuesday, December 9, 2014. Reed initially addressed the pathology revealed by the MRI/CT scans and X-ray images of plaintiff's lumbar spine, and described his "Diagnostic Impressions" as: "Lumbar Arthritis w/o Myelopathy; Lumbar Bulging/Herniated Disc; Lumbar Degenerative Disc Disease; Lumbar Facet Degeneration/Hypertrophy; Lumbar Foraminal Stenosis; Lumbar Lateral Recess Stenosis; [and] Lumbar Radiculitis." *Id*. at 294 (alteration supplied).[124] Dr. Reed summarized the findings upon which his diagnostic opinions were based as follows:

> This is a 45-year-old Caucasian male presenting with an 11-year history
> of progressive lower back and to a lesser degree radicular pain. He has
> 90% axial pain, 10% radicular pain. His axial pain is 50% left, 50%
> right. His radicular pain is 50% left and right. He denies any sensory
> changes, but is aggravated by any activity. It is relieved by using
> medications consisting of Toradol and a recliner. He denies any trauma
> or injury having lead [*sic*] to the onset of his pain. For conservative
> treatment, he has had epidural steroid injections which provided no
> benefit whatsoever. A traction table, however, does provide transient
> benefit. A TENS unit[125] did not provide any benefit.

---

[123] *See also* doc. no. 25, at 524 (same).

[124] *See also id*. at 467 (same); *id*. at 521 (same).

[125] "TENS" is an acronym for "Transcutaneous Electrical Nerve Stimulation." DORLAND'S at 1882. A "TENS unit" is a battery-operated device used to treat pain by delivering small electrical

His examination was performed and revealed decrease[d] sensation of the bilateral legs in a global manner. His strength was within normal limits. He has limited flexion and extension. His reflexes are normal. Straight leg raising is bilaterally symmetrical and causes no significant pain. He does use a cane on the right with an antalgic gait.[126] His pain scale is [*at*] worst 6 to 7. His low back pain radiates to the left buttocks and hips.

In terms of past medical significant history, he two years ago did suffer from a motor vehicle accident with multiple fractures, most significant involving the pelvis. This has not had no impact [*sic*] on his lumbar spine pain however.

Plain x-rays reveal a normal lumbar spine with no instability on flexion and extension. Intervertebral disc heights are well maintained.

On MRI scan, mild degeneration is noted at the discs L4-5 and to a lesser degree L5-S1. There appears to be lateral recess stenosis bilaterally at L4-5 and perhaps some annular tearing and bulging is noted at L4-5 and to a lesser degree L5-S1. Mild bulging of the intervertebral disc is noted on MRI scan at both L4-5 and L5-S1 paracentral to the left side. The ligamentous thickening is noteworthy with mild spinal stenosis being present at L4-5. Facet arthropathy is noteworthy at L4-5 and L5-S1.

IMPRESSION:
Activity related back pain, axial associated with minimal degenerative changes at L4-5 and L5-S1 and mild spinal stenosis, moderate lateral recess stenosis at L4-5 with facet arthropathy bilaterally at L4-5 and L5-S1.

Doc. no. 25, at 295 (alterations and footnotes supplied).[127] Dr. Reed recommended

---

impulses through electrodes attached to a person's skin with adhesive pads. *See*, *e.g.*, https://www.medicalnewstoday.com/articles/323632.php (last visited Mar. 25, 2019).

[126] "Antalgic" means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." DORLAND'S at 97.

[127] *See also* doc. no. 25, at 468 (same); *id*. at 522 (same); *id*. at 1399 (same); *id*. at 470

the following surgical procedures:

> PLAN: In terms of attempting a surgical resolution of this gentleman with fibromyalgia as a rather guarded prognosis, with respect to his previous trauma, history of fibromyalgia and chronicity of his problems and the fact that he has 90% axial pain however, a decompression to be carried out through the right side at L4-5 with foraminotomy and bilateral decompression may be helpful given his history of improvement with traction. Thus he will be scheduled for a right-sided L4-5 laminotomy and foraminotomy decompression of the nerve root with possible bilateral decompression in combined with [*sic*] destruction via thermal ablation of the paravertebral facet joint nerves bilaterally at L3-4, bilaterally at L5-S1 and on the left side at L4-5.

*Id*.[128] Dr. Reed also addressed the following contingencies: X-rays and MRI/CT scans identified problems in plaintiff's cervical spine; some of those problems also might require surgery in order to relieve symptoms; but, "one surgery will not address all problems identified, and . . . additional surgery at an additional cost in the future may be needed." *Id*. at 294 (ellipsis supplied).[129]

**2. December 10, 2014:** *Lumbar spine surgery*. The surgical procedures performed on plaintiff's lumbar spine on Wednesday, December 10th included: destruction by means of thermal ablation ("DTA") of the Paravertebral Facet Joints nerve at the L3-L4 lumbar disc spaces, the L4-L5 lumbar disc spaces, and the L5-S1 vertebral segment (the lumbosacral joint); as well as a Laminotomy, Foraminotomy,

---

(Physician's "Operative Report"); *id*. at 553 (same).

[128] *See also* doc. no. 25, at 468 (same); *id*. at 522 (same); *id*. at 1399 (same).

[129] *See also id.* at 467 (same); *id*. at 521 (same).

and Decompression ("LFD") of the Nerve Root at the L4-L5 lumbar disc space.  *See id*. at 294 (five-column table at top of page);[130] *see also id*. at 471-72 (Dr. Reed's summary of operative procedures and findings).[131]

**3. December 11, 2014:**  *Post-op assessment*.  Dr. Reed met with plaintiff the day after surgery and addressed the issues in his cervical spine.  The report of that meeting contains the following information:

> CHIEF COMPLAINT: Bilateral hand numbness, tingling and weakness over the long, ring and small fingers slightly worse on the left than the right hand.
>
> HISTORY OF PRESENT ILLNESS:  This gentleman *with fibromyalgia for 9 years now* has been having symptoms in his hand which have been worsening.  Yesterday, he just underwent lumbar spine surgery for decompression and symptoms in his lower extremities.  He is doing well with good relief of symptoms.  He is now encouraged to have his cervical spine treated for similar symptoms in his upper extremity.
>
> PHYSICAL EXAMINATION:  Examination does not show profound weakness, but does show numbness and tingling over the long, ring and small fingers.  His ulnar nerves are specifically without tenderness to percussion or displacement or palpitation.  The symptoms do not seem

---

[130] *See also id.* at 467 (same).  The five-column table at the top of pages 294 and 467 summarizes the surgical procedures performed on Dec. 10, 2014, and, the spinal levels at which each procedure was performed.  The seven-column tables found at pages 281 and 553-55 also summarize Dr. Reed's Dec. 10th surgical procedures.

[131] *See also* doc. no. 25, at 471-72 (same); *id*. at 1402-03 (same)*.*

to be reproduced by any peripheral compression. Phalen test[132] and percussion test at the wrist also do not produce any of the similar symptoms.

OBJECTIVE FINDINGS: X-rays of the cervical spine are essentially normal.

MRI scan shows a superior extrusion of the nucleus pulposus centrally and slightly to the left side at C6-7 which is causing cord deformity and displacement.

IMPRESSION: Central cord syndrome from herniated/extruded nucleus pulpous in a superior direction of C6-7.

PLAN: Anterior cervical discectomy[133] and fusion at the C6-7 level. This was also discussed with Thomas Francavilla, MD who has reviewed the MRIs with me and concurs with the planned for anterior opposed to posterior surgery[134] due to the central placement and superior extrusion of the nucleus material and central cord symptoms.

*Id*. at 515-16 (emphasis and footnotes supplied).[135]

**4. December 17, 2014:** *Cervical spine surgery*. A second surgery — a

discectomy of the herniated disc between plaintiff's C6 and C7 cervical vertebrae,

---

[132] A "Phalen's Test" is one means of testing for Carpal Tunnel Syndrome, and requires the patient to flex his wrists maximally and hold the dorsal side (*i.e.*, upper side) of his hands together for one minute. The test is positive if the patient experiences tingling in the thumb, index finger, middle finger, and the lateral half of the ring finger. *See, e.g.*, https://www.physio-pedia.com/Phalen_Test (last visited Feb. 18, 2019). *Cf.* DORLAND'S at 1896.

[133] "Discectomy" is a surgical procedure to remove the damaged portion of a herniated spinal disk. *See, e.g.*, https://www.mayoclinic.org/tests-procedures/diskectomy/about/pac-20393837 (last visited Feb. 18, 2019).

[134] An anterior approach (*i.e.*, from the front, as opposed to from the rear, "a posterior approach") to spinal surgery is a minimally-invasive technique for gaining access to the spinal disc space, "with minimal risks or unwanted after effects for the patient." https://www.spine-health.com/treatment/back-surgery/cervical-spine-surgery (last visited Feb. 17, 2019).

[135] *See also* doc. no. 25, at 1406-07 (same).

and fusion of the spinal segment located near the bottom of the cervical spine[136] —

was performed at the Laser Spine Institute on December 17, 2014.  The surgeon was

Dr. Thomas I. Francavilla, but Dr. Reed assisted.  Dr. Francavilla's operative notes

contain the following information:

> Procedure:   Anterior cervical discectomy, allograft fusion[137] and
> anterior instrumentation C6-7.
>
> Procedure in Detail:  The patient was administered general anesthetic
> and placed supine on the operating frame with the neck extended.  The
> cervical area was prepped and draped in a sterile manner.  A transverse
> incision was made on the right side of the neck through the skin and
> underlying dermal layers.  The platysma was separated.  Pretracheal
> fascia was incised.  The trachea and esophagus were retraced medially
> and the carotid sheath laterally.  The prevertebral fascia was incised and
> the medial border of the longissimus colli muscle was cauterized and
> elevated.  Self retaining retractor blades were placed under the muscles.
> Fluoroscopy identified C6 and C7 and Casper [*sic*: "*Caspar*"[138]] posts
> placed.  Distraction applied.  The operative microscope used to assist
> with direct visualization.  A discectomy was performed.  The posterior

---

[136] "Spinal fusion is surgery to permanently connect two or more vertebrae in your spine, eliminating motion between them.  Spinal fusion involves techniques designed to mimic the normal healing process of broken bones.  During spinal fusion, your surgeon places bone or a bonelike material within the space between two spinal vertebrae.  Metal plates, screws and rods may be used to hold the vertebrae together, so they can heal into one solid unit."  https://www.mayoclinic.org/tests-procedures/spinal-fusion/about/pac-20384523 (last visited Mar. 22, 2019).

[137] "Allograft" refers to a tissue graft from a donor of the same species as the recipient but not one who is genetically identical.  *See* https://www.medicinenet.com/script/main/art.asp?article key=30941 (last visited Mar. 22, 2019).  *See also* DORLAND'S at 51 (defining the same term as "a graft of tissue between individuals of the same species but of disparate genotype; types of donors are cadaveric, living related, and living unrelated").

[138] "The Caspar Cervical Distractor System offers precision designed instrumentation and techniques that are considered the gold standard in cervical distraction." https://www.aesculapim plantsystems.com/products/spine-solutions/cervical-solutions/ccd-caspar-cervical-distractor  (last visited Mar. 22, 2019).

longitudinal ligament was opened sharply and bilateral foraminotomy was performed. The C7 nerve roots were quite well decompressed. There was a fragment of disc in the canal which extruded upon opening the ligament. Allograft was then tamped into the disc space under slight distraction and a cervical plate supplied by Zimmer was screwed into the vertebral bodies of C6 and C7 with variable angled screws. The locking mechanism was ensured.

There was copious irrigation and meticulous hemostasis [*i.e.*, stopping the flow of blood]. The incision was closed in layers with Vicryl sutures. The patient tolerated the procedure without incident.

The assistant was William Oliver Reed Jr. MD who provided assistance with retraction, drilling, irrigation and cauterization along with closure.

Doc. no. 25, at 568 (alteration and footnotes supplied).[139]

**5. Post-operative evaluations**. Dr. Francavilla addressed the following subjects prior to plaintiff's discharge on Friday, December 19, 2014:

Discussed resumption of previously prescribed medication including blood thinners.
Patient instructed to call the office if they [*sic*] have increased pain, problems, or questions.
Risks and outcomes of surgery (bleeding, infection, unresolved pain).
Reinforce[d] the importance of continuing to monitor for signs and symptoms of infection, and to call if any occur.
Stressed importance of gradually increasing activity and not to lift, carry, push, or pull heavy items for 2-4 weeks.
Patient/caregiver verbalized understanding of instructions on pain cream usage.
The patient was informed and advised of the above and verbalizes understanding of plan of action.

*Id*. at 1348 (alterations supplied).

---

[139] *See also* doc. no. 25, at 478 (same); *id*. at 1409 (same).

59

(a) **December 31, 2014:** *Progress note.* "Eileen Clarke" (a person on the staff of the Laser Spine Institute not otherwise identified in this record) called plaintiff's Alabama home on Wednesday, December 31, 2014, to inquire about his recovery. She subsequently dictated the following notes for his file:

> **Progress Note**:
> Spoke to patient he is complaining of running a low grade fever. He reports his temp is normally 97.6 and now he has a fever of 98.6 to 99.0. He states since he has been home he has been having loose stools and mild abdominal pain. Denies warmth, drainage from incision; denies sinus drainage, cough. Patient has a h/o IBS [*i.e.*, *history of Irritable Bowel Syndrome*]. Recommend follow up with his PCP [*Primary Care Physician*] for further evaluation. Reviewed with patient healing, activity and restrictions. Recommend patient continuously sip ice cold fluiids [*sic*]; shrug shoulders, roll shoulders front and back Q 2 hrs PRN. Patient to call with an update in 1-2 weeks or sooner with any questions or concerns[.]

*Id.* at 1346 (alterations supplied).

(b) **January 22, 2015:** *CR X-Rays.* AP (*i.e.*, anteroposterior, from front-to-back[140]) and lateral (*i.e.*, the side of the body that is farther from the center of the body[141]) digital X-rays[142] were performed with computed radiography ("CR")

---

[140] *See, e.g.*, https://www.medicinenet.com/script/main/art.asp?articlekey=2299 (last visited Mar. 26, 2019).

[141] *See, e.g.*, https://www.medicinenet.com/script/main/art.asp?articlekey=6226 (last visited Mar. 26, 2019).

[142] AP X-rays are films in which the beams pass from front-to-back (anteroposterior), as opposed to a PA (posteroanterior) film in which the rays pass through the body from back-to-front. https://www.medicinenet.com/script/main/art.asp?articlekey=2300; *see also* https://www.med-ed.virginia.edu/courses/rad/cxr/technique1chest.html ("The standard chest examination consists of a PA (posterioranterior) and lateral chest x-ray. The films are read together. The PA exam is viewed

technology[143] at a Decatur, Alabama clinic on Thursday, January 22, 2015,[144] in

accordance with the directions of plaintiff's cervical spine surgeon, Dr. Thomas

Francavilla.  The images revealed that:

> There are postsurgical changes of anterior fusion with metallic hardware
> at C6-7.  There are mild degenerative changes.  There is not evidence of
> fracture, subluxation, or destructive lesion.  There is apparent small
> ligamentous ossification at the posterior mid neck approximately the C5
> level.
>
> Impression:  Postsurgical changes of anterior fusion C6-7.  Mild
> degenerative changes.

*Id*. at 818.[145]

Thomas Freeman, a Physician's Assistant on the staff of the Laser Spine

Institute, placed a telephone call to plaintiff on Friday, February 6, 2015, to ascertain

his post-operative condition, and, to review the X-Rays discussed in the preceding

section.  The following note was dictated for file:

> **Progress Note**:
> The patient is now eight weeks status post C6-7 anterior cervical
> discectomy and fusion.  He reports that he still has some occasional
> discomfort but overall is pleased with his progress to this point in time.
> I shared with him that review of his 6-week postoperative x-rays shows
> stable positioning of the hardware with no acute changes noted.  We will

---

as if the patient is standing in front of you with their right side on your left. The patient is facing towards the left on the lateral view.") (both last visited Feb. 20, 2019).

[143] *See*, *e.g.*, https://www.vareximaging.com/computed-radiography-cr-and-digital-radio graphy-cr-and-digital-radiography-dr-which-should-you-choose (last visited Feb. 20, 2019).

[144] The digital CR X-Ray scans were performed at the "Med-Surg Clinic" in Decatur, Ala.

[145] *See also* doc. no. 25, at 1342 (same).

obtain 12-week x-rays and review those films once they are available. In the meantime, I have asked him to call with any future questions or concerns.

*Id*. at 1343.

        **(c) January 27, 2015 MRI scans**.  A January 27, 2015 MRI scan of

plaintiff's lumbosacral spine[146] disclosed that:

> At L4-5, there is a broad-based disc protrusion with mild right neural foraminal narrowing.[147]

> At L5-S1, there is a broad-based disc protrusion with mild right and moderate left neural foraminal narrowing.  Within each of the lumbar vertebral bodies, there is an oval area of increased signal on T1 and T2-weighted imaging consistent with hemangiomata.[148]

> IMPRESSION

> 1.  Mild lumbosacral spine degenerative disease.

> 2.  Multiple benign vetebral body hemangiomata.

*Id*. at 647 (footnote supplied).  Plaintiff also received a "Normal cranial MRI scan"

---

[146] The spine is composed of 33 interlocking bones called vertebrae. The lumbosacral region of the spine consists of five lumbar vertebrae and the sacrum (five bones joined together). *See*, *e.g.*, https://www.healthlinkbc.ca/health-topics/aa154160 (last visited Feb. 18, 2019).

[147] "Foramen" is a term that describes the hollow bony archway in adjacent spinal vertebrae, creating a passageway through which all spinal nerve roots run.  As a spinal nerve branches from the spinal cord, it exits through such openings and travels to organs, muscles and sensory structures of the body. *See*, *e.g.*, https://www.spine-health.com/glossary/foramen (last visited Feb. 17, 2019).  It follows that "foraminal narrowing" refers to a loss of space, or narrowing, of the foramen. *See*, *e.g.*, https://northamericanspine.com/conditions/foraminal-narrowing/ (last visited on Feb. 17, 2019).

[148] "Hemangioma" is a congenital benign tumor of blood vessels, often forming a red birthmark. *See*, *e.g.*, https://medical-dictionary.thefreedictionary.com/hemangiomata (last visited Feb. 17, 2019).  "Hemangiomata" is the plural form of that term. *See also* DORLAND'S at 831.

on the same date.  Doc. no. 25, at 648.

MRI scans of plaintiff's thoracic and cervical spine performed on the same date
indicated that the "intrinsic qualities of the thoracic spinal cord appear[ed] normal."
*Id*. at 650 (alteration supplied).  Even so,

> a broad based central disc protrusion but no significant central or neural
> forminal narrowing [was seen in the space between the cervical C5 and
> C6 discs].  The remainder of the intervertebral disc spaces and vertebral
> bodies appear[ed] normal.  The craniocervical junction [also appeared
> to be] normal.

*Id*. at 649 (alterations supplied).

**(d)  February 2, 2015:**  *Pain complaints*.  Plaintiff placed a telephone
call to the Laser Spine Institute on Monday, February 2, 2015, and spoke with Eileen
Clarke about his pain concerns.  She dictated the following notes following their
conversation:

> **Progress Note**:  Patient called back, he reports having pain between his
> shoulder blades.  He asked if this could be related to a thoracic disc.
> Discussed cervical anatomy, post op healing, activity and restrictions.
> Patient also complaining of a feeling of a "lump" in his throat.  He also
> reports he has been sitting with his computer in his lap and using it that
> way.  He states when he does that he has increase[d] pain between his
> shoulder blades.  Recommend continuously sippping [*sic*] ice cold
> fluids; shrugging shoulders, rolling shoulders front and back; lift
> computer so as to not look down with head; using warm compress to
> area between shoulder blades 15-20 min QID PRN; physical therapy.
> Patient had his 6 week post[-]op xray.  Will contact Decatur Med Surg
> Clinic (265-353-2000) to have report faxed and verify that CD has been
> mailed.  Patient also complained of low back pain that radiates into

bilateral buttocks, radiating around lateral hips into anterior thighs. Recommend using ice to surgical area 15-20 min QID PRN[149]; begin exercise DC; physical therapy. Message sent to Cibele to send Rx for PT. Patient to call in 1-2 weeks with an update or sooner with any questions or concerns.

*Id*. at 421 (alterations and footnote supplied).[150]

      **(e) February 16, 2015 neurological evaluation**. Plaintiff's follow-up neurological evaluation by Dr. LaGanke on Monday, February 16, 2015, generated the following, extensive notes:

HPI: Here today to f/u on Demyelinating disease. Klonopin has knocked him out but unable to take during the day. Strobe effect does cause him to be nauseated. He will also have numbness in his left cheek after strobe effect.

Frequency of "spinning in head" has increased and worse with driving. Has to "intently" focus to keep from passing out followed by "instant migraine" and severe fatigue. Has had syncope[151] with 25% of these epsidodes [*sic*]. Spinning is always on the left side of brain. Was in a "near fatal" MVA 2 years ago hit on drivers side and pushed over to passengers seat – hit head on DVD deck and cleared it to passenger side.

---

[149] "QID," when written as here, in capital letters and without periods, stands for "*quaque die*" (which, in Latin, means once a day), but when written in lower-case letters and with periods ("q.i.d.") means 4 times a day from the Latin *quater in die*. *See, e.g.*, https://www.medicinenet.com/script/main/art.asp?articlekey=13561 (last visited Mar. 26, 2019). *Compare with* note 103, *supra* (defining "PRN").

[150] *See also* doc. no. 25, at 1345 (same).

[151] "Syncope" refers to a temporary loss of consciousness, usually related to insufficient blood flow to the brain. It's also called fainting or "passing out," and is referred to by physicians as either syncope or a syncopal episode. https://www.healthline.com/health/syncopal-episode. "It most often occurs when blood pressure is too low (*hypotension*) and the heart doesn't pump enough oxygen to the brain. It can be benign or a symptom of an underlying medical condition." https://www.heart.org/en/health-topics/arrhythmia/symptoms-diagnosis-monitoring-of-arrhythmia/syncope-fainting (both websites last visited Mar. 26, 2019).

Was hit by post on left side of car in the left side of head. Nothing seems to trigger spinning issues but randomly occur 4-5 times per week. Usually occur in afternoons or night. Had one last night without syncope.

Has approximately 2-3 migraines per month-with photophobia-NV – usually on left side of head and rarely on right side of head. The right side migraines are "more severe." Takes Imitrex injection[152] – resolves within an hour.

Has staring episodes intermittently – felt it might be related to his fatigue. Past 9 months in the middle of telling something and "go completely blank." Has to ask what he was talking about or may repeat everything again.

Has times of partial incontinence – never lost total control in past few months. Did have issues immediately following the MVA with urinary incontinence. Had to wear pads for several months.

Post low back surgery – tingling and numbness much decreased but if he sits very long will have numbness and tingling after 10 minutes bil lower extremities.

Balance unsteady – using his cane–averages a few falls per month – legs just "quit working" and he falls or if his head starts to spin he will fall. No injuries with falls.

Family members he has known all his life – cannot recall names in past several months. At times while driving "forget where I am at" past 2 years.

He is a computer programmer – very difficult to stay focused. "Suddenly forgets" what he is doing.

---

[152] Imitrex injection (generic name *sumatriptan succinate*) is a selective serotonin receptor agonist used to treat migraine headaches. *See, e.g.*, https://www.rxlist.com/imitrex-injection-side-effects-drug-center.htm (last visited Mar. 26, 2019).

Has IgG deficiency – IVIG monthly – first time in his life that he has not had URI [*i.e., upper respiratory infections of the air passages of the nose, throat, and/or bronchial tubes*] and several co-infections this winter.

Hard time sleeping at night-even with Lunesta. Hard time "staying asleep." Hard to stay in any position more than 10 minutes due to pain and discomfort – usually in his torso. Had multiple internal injuries in the MVA [*motor vehicle accident*] and several things removed post MVA.

Has chronic pain in hips, pelvis and entire spine. Since neck fusion has difficulty turing [*sic*] his head. Denies diplopia, dysarthria. Neck fusion 12/17 and has had dysphagia since–plate against esophagus.

*Id*. at 1235-36 (alterations and footnotes supplied).[153]  At the conclusion of his examination, Dr. LaGanke recommended that plaintiff have an EEG, continue his current prescription medications (but increase his daily dosage of Vimpat[154]), and come back for a follow-up examination in three to four months. *See id*. at 1238.

    **(f) March 4, 2015:** *CR scans*. Computed Radiography ("CR") scans of plaintiff's cervical spine performed pursuant to directions of Dr. Francavilla at the Decatur, Alabama "Med-Surg Clinic" on this date revealed that:[155]

---

[153] *See also* doc. no. 25, at 1419-20 (same).

[154] Vimpat® is the brand name for a drug (generic name ""Lacosamide") "used alone or together with other medicines to help control partial seizures (convulsions) in the treatment of epilepsy. It acts on the central nervous system (CNS) to reduce the number and severity of seizures." https://www. mayoclinic.org/drugs-supplements/lacosamide-oral-route/description/drg-20072409 (last visited Feb. 19, 2019).

[155] *See*, *e.g.*, https://www.vareximaging.com/computed-radiography-cr-and-digital-radio graphy-dr-which-should-you-choose (last visited Feb. 20, 2019).

> There is anterior screw plate fusion C6/C7. There is facet bony overgrowth producing neural foraminal encroachment C4/C5 and C5/C6 bilaterally. The remaining disk spaces are well maintained. No precervical swelling.
>
> Impression: Bilateral neural foraminal encroachment. Anterior cervical fusion.

Doc. no. 25, at 819. An electroencephalogram ("EEG") of plaintiff's cranium,[156] performed under the supervision of Dr. LaGanke on March 12, 2015, yielded "normal" results (*i.e.*, "No focal, diffuse or generalized abnormalities were noted"), but with this caveat: "The absence of epileptiform discharges during the EEG recording does not rule out the diagnosis of a seizure disorder." *Id*. at 485.[157]

**F.**    **April 3, 2015:** *Plaintiff's claim for total disability benefits under a separate policy issued by a non-party, the Metropolitan Life Insurance Company*

Plaintiff submitted on this date a claim for supplemental "total disability benefits" under the terms of a separate policy issued by a non-party, the Metropolitan Life Insurance Company ("MetLife"). *See id*. at 1011-13. He stated that his claim was based upon "multiple spine surgeries to correct bulging/herniated/ruptured discs, stenosis, osteoarthritis, COPD (chronic obstructive pulmonary disease), fibromyalgia, and possible mini seizures," *id*. at 1015 — conditions which he described as making him unable to "sit (even for short periods), keep [his] neck in a fixed position (the

---

[156] See note 18, *supra* (defining electroencephalogram (EEG)).

[157] *See also* doc. no. 25, at 515 (same).

surgeons told me not to look up or down due to cervical plate), use a computer repetitively due to loss of limb control, walk to/from meetings, etc." *Id*. at 1018 (alteration supplied). He explained that,

> due to the herniated lumbar disc, the ruptured cervical disc and subsequent fusion, the numerous bulging discs (cervical, thoracic, and lumbar), the degenerative arthritis and stenosis on the spine, the osteoarthritis, *the fibromyalgia*, the COPD, as well as the potential seizures and multiple sclerosis, I am in constant pain not to mention not being able to control my limbs with normality. After walking a short distance I have to recline or lie down to catch my breath.

*Id*. at 1018 (emphasis supplied).

**G.    July 17, 2015:** *Neurological evaluation*

Dr. LaGanke dictated the following notes following his Friday, July 17, 2015 examination of plaintiff:

> HPI: Mr. Wiley presents in follow up of his demyelinating disease. He states that in December he had *two spine surgeries* which *have not seemed to help*. He had a fusion at C6-7 and a discectomy at L4-5. *He still has numbness and pain in his upper and lower extremities. He stumbles often*. He maybe [*sic*] up for 10 minutes but then has to sit down for 30. He drops items frequently because of numbness in his hands. He states that the Vimpat was helping his dysesthesias but he cannot afford the medication. He states that insurance is no longer paying for his IVIG. He had gone without an upper respiratory infection until they stopped paying for the IVIG. Since April, he has had upper respiratory infections with multiple courses of antibiotics and Prednisone. He states that he believes it is ironic that on the IVIG he had no infections during a very contagious season and when he comes off the treatment he has multiple infections. He denies any diplopia, dysphagia or dysarthria. He denies any bowel or bladder dysfunciton.

68

*From his MRI imaging he had cervical stenosis with a syrinx and a thoracic vertebral body fracture.*  He states that he has had no recent seizures.

Doc. no. 25, at 1241 (emphasis supplied).[158]

**H.     July 29, 2015:** *Nerve conduction study*

Dr. LaGanke ordered a nerve conduction study and conveyed his analysis of the results by a letter addressed to plaintiff on Wednesday, July 29, 2015: "The nerve conduction study you recently had done at our office showes [*sic*] a slowing in the peripheral nerves [and] shows some demyelinating neuropathy at this time.  If you have questions, please call my office."  *Id*. at 975 (alterations supplied).[159]

**I.     August 18, 2015:** *Examination by primary care physician*

Dr. David Francis dictated the following notes after his August 18, 2015 examination of plaintiff:

**Complaint**:
Mr. Wiley is here for his health maintenance visit.
Patient is here for follow up of *hyperlipidemia*.  Condition is well controlled with treatment regimen.  He is currently asymptomatic.
He is here for follow up of *gastroesophageal reflux disease*.  He denies dyspepsia or dysphagia and says symptoms controlled with current treatment regimen.   He is here for follow up of *irritable bowel syndrome*.  Still problems after meals eaten out and has to be careful, meds help some.
*Patient is here for follow up of chronic back pain*.  Still seeing Dr. Leganke for MS [*multiple sclerosis*].  *Zanaflex not effective in relieving*

---

[158] *See also id*. at 1424 (same).

[159] *See also id*. at 663 (same).

*back pain. Cervical spine still causing choking sensation. Hurting up and down back entire length with numbness and shooting pain into all extremities*. Still working on getting disability.

Patient is here for follow up of a *migraine headache*. Condition is well controlled with treatment regimen. He is currently asymptomatic.

Mr. Wiley is here for *sleep disorder*. Trouble sleeping all night due to pain, often up all night due to same despite meds.

He is in today for follow up of *pre-diabetes*. He states that condition is well controlled with current treatment regimen. At present, he is asymptomatic.

*Id*. at 1364 (emphasis and alteration supplied).

**J.      September 20, 2015:** *Plaintiff's subject claim for long-term disability benefits*

Plaintiff submitted to defendant the claim for long-term disability benefits that is the subject of the present action on Wednesday, September 30, 2015. *See id.* at 670-72. In addition to the information typed into the "Health Questionnaire" portion of the printed claim form, *see, e.g., id.* at 672, plaintiff handwrote the following information on the "Fax Cover Sheet" that accompanied the transmission:

- ⊖ I also take IVIG infusions monthly due to a defective immune system.

- ⊖ I also take Zanaflex[160] 4 mg, 2 pills 3x a day for pain

- ⊖ My Tramadol[161] has been increased to 50 mg, 2 pills 3x a day for

---

[160] Zanaflex® is the brand name for a group of drugs with the generic name of *tizanidine* that act upon the central nervous system in order to "help relax certain muscles in your body. It relieves spasms, cramping, and tightness of the muscles caused by medical problems, such as multiple sclerosis or certain injuries to the spine." https://www.mayoclinic.org/drugs-supplements/tizanidine -oral-route/ description/drg-20066921 (last visited Feb. 19, 2019).

[161] Tramadol is the generic name for a group of drugs "used to relieve moderate to moderately severe pain, including pain after surgery. The extended-release capsules or tablets are used for

pain

- I also take Vimpat 100 mg, 1 pill 2x a day for seizures

- I have been diagnosed with CIDP [*chronic inflammatory demyelinating polyneuropathy*[162]], COPD [*chronic obstructive pulmonary disease*], degenerative arthritis, degenerative disc disease, seizures, *fibromyalgia*, osteoarthritis, demyelinating neuropathy, lung damage, possible multiple sclerosis, stenois, herniated discs, disautonomia, IBS (irritable bowel disease), migraines, severe nausea, GERD [*gastroesophageal reflux disease*], tachardia (due to ruptured diaphragm and subsequent misalignment after repair) 5 pelvic breaks (from accident several years ago that never healed back correctly), sleep deprivation due to constant pain, recurrent UTI/prostatitis,[163] memory lapse

*Id*. at 669 (alterations, emphasis, and footnotes supplied).

1.    **October 9, 2015:** *Submission in support of plaintiff's claim by Dr. Francis*

Dr. David Francis, plaintiff's primary care physician, completed a "Physician's

---

chronic ongoing pain. Tramadol belongs to the group of medicines called opioid analgesics. It acts in the central nervous system (CNS) to relieve pain."https://mayo.clinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited Feb. 19, 2019). *See also* notes 63 and 106, *supra* (defining "tramadol hydrocholoride" – brand name Ultram®).

[162] CIDP is an acronym for *chronic inflammatory demyelinating polyneuropathy*: "a rare neurological disorder in which there is inflammation of nerve roots and peripheral nerves and destruction of the fatty protective covering (myelin sheath) over the nerves. This affects how fast the nerve signals are transmitted and leads to loss of nerve fibers. This causes weakness, paralysis and/or impairment in motor function, especially of the arms and legs (limbs). Sensory disturbance may also be present. The motor and sensory impairments usually affect both sides of the body (symmetrical), and the degree of severity and the course of disease may vary from case to case. Some affected individuals may follow a slow steady pattern of symptoms while others may have symptoms that stabilize and then relapse." https://rarediseases.org/rare-diseases/chronic-inflammatory-demyelineating-polyneuropathy/ (last visited Mar. 26, 2019).

[163] "UTI" is an acronym for "urinary tract infection." DORLAND'S at 2013. "Prostatis" is "inflammation of the prostate." *Id*. at 1530.

Statement" form on Friday, October 9, 2015. He stated that plaintiff's primary diagnoses were back pain and weakness, which were due to disc disease and peripheral neuropathy, and which had been identified by MRI and nerve conduction studies beginning in March of 2012. Dr. Francis stated that plaintiff should avoid any work above the sedentary level, and that he was limited in bending, walking without assistance, lifting, and standing on his feet for an extended period. He also opined that plaintiff had reached maximum medical improvement, but that during an eight-hour work day, he could sit, stand, and walk for only one hour each. Plaintiff had unspecified restrictions in driving, operating motorized equipment, lifting, carrying, using his feet in repetitive movements, bending, squatting, crawling, and climbing, but he did not have any limitations in using his hands for repetitive motions or reaching above shoulder level. Plaintiff was unable to perform repetitive work, perform at a constant pace, perform a variety of duties, and work alone or apart in physical isolation from others. He had no limitations in his abilities to: follow work rules; maintain attention and concentration; understand, remember, and carry out complex job instructions; attain set limits and standards; relate to co-workers; interact with supervisors and the public; use judgment and make decisions; direct, control, or plan activities of others; influence people in their opinions, attitudes, and judgments; and express personal feelings. Dr. Francis stated that there were no functions of

plaintiff's own or usual occupation that he could no longer perform, but then stated, inexplicably, that plaintiff could perform "no work." Plaintiff was never expected to return to his prior level of functioning, and vocational rehabilitation was not recommended. *See* doc. no. 25, at 430-32.

> **2.      October 15, 2015:** *Submission in support of plaintiff's claim by Dr. LaGanke*

Plaintiff's treating neurologist, Dr. Christopher LaGanke, submitted a "Physician's Statement" form on Thursday, October 15, 2015. He listed plaintiff's primary diagnosis as demyelinating disease, which caused parethesia,[164] pain, fatigue, and weakness, and had been identified through electromyography ("EMG")[165] and electroencephalogram ("EEG") studies,[166] a magnetic resonance imaging test ("MRI"), laboratory work, and physical and neurological examinations. Plaintiff also suffered from peripheral neuropathy,[167] lumbar radiculopathy,[168] cervical stenosis,[169] myelopathy, headaches, and IgG deficiency. His symptoms first appeared in January of 2010, and he had been treated with medications, physical therapy, and spinal epidural injections. Dr. LaGanke opined that plaintiff should avoid temperature

---

[164] See note 16, *supra* (defining "paresthesia").

[165] See note 17, *supra* (defining "electromyography (EMG)").

[166] See note 18, *supra* (defining "electroencephalogram (EEG)").

[167] See note 22, *supra* (defining "peripheral neuropathy").

[168] See note 23, *supra* (defining "lumbar radiculopathy").

[169] See note 24, *supra* (defining "cervical stenosis").

extremes, frequent walking, climbing, operating heavy machinery, and heavy lifting. He stated that plaintiff's prognosis for recovery was "fair." But, he also indicated that plaintiff had achieved maximum medical improvement and would never experience fundamental changes in his medical condition. During an eight-hour work day, plaintiff could sit for four hours, stand for one to two hours, and walk for one to two hours. He was advised to avoid all driving and operation of motorized equipment due to his history of seizures and previous motor vehicle accident. He was limited to an unspecified degree in lifting and carrying as a result of his neck and spinal surgeries. He could not use his hands and feet in repetitive actions because of numbness in his upper and lower extremities, and his abilities to bend, squat, crawl, climb, and reach above shoulder level were limited to an unspecified extent. Plaintiff was not limited in his abilities to follow work rules, attain set limits and standards, relate to co-workers, interact with supervisors and the public, use judgment and make decisions, express personal feelings, and work alone or apart in physical isolation from others. He was "somewhat limited" in his abilities to: perform repetitive work; perform at a consistent pace; maintain attention and concentration; perform a variety of duties; understand, remember, and carry out complex job instructions; direct, control, or plan activities of others; and influence people in their opinions, attitudes, and judgments. Dr. LaGanke did not respond to the question, "What functions of the person's

own/usual occupation is the person unable to perform?" He did state that plaintiff's functional restrictions included frequent rest periods, and alternating sitting, standing, and walking every ten to fifteen minutes. *Id*. at 412-414.

**K.     November 11, 2015:** *Non-party Metropolitan Life Insurance Company grants plaintiff's separate claim for total disability benefits*

As noted in Part F., *supra*, plaintiff submitted a claim for supplemental "total disability benefits" under the terms of a separate Metropolitan Life Insurance Company ("MetLife") policy on Friday, April 3, 2015. *See id*. at 1011-13. MetLife granted the claim by means of a letter mailed to plaintiff on Wednesday, November 11, 2015. The pertinent portions read as follows:

> Dear Mr. Wiley:
>
> We are writing to provide you with an update on our evaluation of your claim for total disability benefits under the above numbered policy.
>
> By way of review, we note that you are claiming Total Disability commencing December 8, 2014[170] due to back and neck pain, Fibromyalgia, COPD, seizures and Multiple Sclerosis. We have previously issued Total Disability benefits for the period of December 8, 2014 through March 11, 2015 minus a 90-day elimination period during which time no benefits are payable.
>
> This policy states in part that :
>
> **Total Disability or Totally Disabled** means that due solely to

---

[170] Plaintiff's MetLife claim stated that the "Date Last Worked" was Friday, December 4, 2014. Doc. no. 25, at 1015. The first work day thereafter was the date stated here: Monday, December 8, 2014.

Impairment caused by Injury or Sickness, You are:

1. Before the end of the Regular Occupation Period Shown on page 3 (Age 65):

   a. Prevented from performing the material and substantial duties of Your Regular Occupation;

   b. Not Gainfully Employed; and

   c. Receiving appropriate care from a Physician who is appropriate to treat the condition causing the Impairment.

Please note that this policy provides a monthly base benefit of $1,200 following a 90-day elimination period, during which time no benefits are payable. The maximum benefit period for this policy is to Age 65.

To date, we have obtained medical records from The Laser Spine Institute, Dr. Christopher Laganke, Dr. David Francis, Dr. Keith Young and Dr. Kevin Meyers. Additionally, to supplement the medical records on file, we reached out to Dr. Laganke and Dr. Francis to gain a better understanding of your claimed medical conditions and what, if any, restrictions and limitations you may have experienced since your claimed date of disability.

*Based on our review of the above information as it pertains to your non-musculoskeletal conditions, to include a review of your consulting board certified family medicine physician, we find that you have experienced restrictions and limitations as a result of Fibromyalgia that would cause you to be Totally Disabled, to include: patient reported widespread constant pain and fatigue.*

As the policy's 90-day elimination period was previously satisfied, we are issuing a check representing benefits for the period of March 12, 2015 through November 7, 2015. This check will be sent under separate cover, and future benefits, if payable, will be issued on or around the 7th

of every month while you remain Totally Disabled per the terms of the policy. Additionally, we will place the policy in Waiver of Premium commencing March 12, 2015, and any refund due back to you will be sent under separate cover.

As a result of our review of the above information as it pertains to your Multiple Sclerosis, COPD and seizures, we find that restrictions and limitations are not substantiated by the medical information available to us.

Additionally, in regard to your back and neck pain, we note that we previously found a recovery period of 12 weeks from the date of your December 17, 2014 C6/7 discectomy and fusion to be reasonable, and, as such, issued a check representing benefits for the period of December 17, 2014 through March 11, 2015, less the policy's 90-day elimination period during which time no benefits are payable. Based on our continued review of the above noted medical records, we find that extended restrictions and limitations related to your back and neck are not currently substantiated.

Please note that as restrictions and limitations for Multiple Sclerosis, COPD, seizures, back pain or neck pain are not substantiated by the medical information currently on file, benefits are being issued based on your claim for Fibromyalgia and the resulting restrictions and limitations as noted above.

Mr. Wiley, as always, should you have any questions or concerns, please do not hesitate to contact me. My telephone number is 800-929-1493, extension 4534. You may also utilize my direct fax at (908) 552-2042.

*Id*. at 690-91 (footnote and emphasis supplied).[171]

**L.** **December 18, 2015:** *Evaluation by defendant's nurse-consultant*

Denise Theisen, a nurse-consultant employed by defendant to review plaintiff's

---

[171] *See also id*. at 1021-22 (same).

medical records,[172] stated the following opinions in a December 18, 2015 report:

> **Medical Analysis**: Claimant went off work in December 2014 with diagnoses of lumbar and cervical degenerative disc disease. MRI of the lumbar spine showed lumbar disc degeneration and stenosis. MRI of the cervical spine showed central cord syndrome. Claimant underwent laminotomy/foraminotomy[173] bilateral decompression at the L4-5 with destruction via thermal ablations at L3-5 bilaterally, left side at L4-5 and bilaterally at L5-S1. Thermal ablation of dorsal sensory branches of the facet nerves at the L4-5 level on the right side on 12/10/14. Claimant underwent anterior cervical discectomy, allograft fusion (ACDF) and anterior instrumentation C6-7 on 12/17/14. File notes long standing history of chronic neck and low back pain (10) years prior to surgeries. Claimant with progression of symptoms into arms/hands and legs. Reasonable that claimant would have had restrictions precluding previous strength demand to allow for surgery and surgical recovery up to 2 months (February 2015). As of February 2015, claimant having some shoulder blade discomfort. Claimant voiced using laptop computer while it was on his lap. MD recommended physical therapy and follow up x-rays at 12 weeks post op. No further visits noted with orthopedic/spine MD beyond February 2015 including x-rays. No PT [*physical therapy*] notes to confirm that claimant complied with this treatment recommendation. Further visits with neurology and PCP [*primary care physician*] for chronic conditions and complaints. History: COPD [*chronic obstructive pulmonary disease*], hypercholesterolemia, GERD [*gastroesophageal reflux disease*], irritable bowel syndrome, back pain, headache (migraine), multiple sclerosis (CIDP [*i.e., chronic inflammatory demyelinating*

---

[172] *Id.* at 616-20 (detailed summary of the medical information reviewed by Nurse Theisen).

[173] A *laminotomy* is a form of spinal decompression surgery that involves the partial removal of the *lamina* that covers and protects the spinal canal and the spinal cord (as distinguished from a *laminectomy*, which entails a complete removal of the lamina), whereas *foraminotomy* refers to the removal of bone around the neural foramen: *i.e.*, the space between vertebrae where the nerve root exits the spinal canal. A *foraminotomy* is used when disc degeneration has caused the height of the foramen to collapse, resulting in a pinched nerve. It can be performed in conjunction with either a *laminotomy* or *foraminotomy*. *See, e.g.*, https://www.mayfieldclinic.com/PDF/PE-decompression.pdf.

*polyneuropathy*[174]] seizure disorder (absence) and prediabetes. Claimant with complaints of frequent migraines, leg give way causing falls (no injuries), use of cane for ambulatory assist, intermittent incontinence, forgetfulness, insomnia and feels like lump in throat. Exams have shown entire spine tenderness, decreased sensation, reflexes, and showed gait weakness and use of cane. Treatment has been medications and recommendations for physical therapy. No confirmation that claimant has participated in formal physical therapy. No evidence on any exams that claimant is accompanied to visits, required a driver, required assistance getting on and off exam tables, is unable to perform own ADL's [*activities of daily living*], shop for personal needs, perform household chores or handle personal finances. Claimant appears to have recovered from cervical and lumbar surgeries without significant complications. Based on current documentation, reasonable to allow for surgeries and post surgical recovery through February 2015. Claimant has had other multiple conditions/symptoms chronically without evidence of a significant physical functional impairment on exams/testing. Claimant initially treated with IVIg for immune deficiency/neuropathy but had to discontinue this when insurance stopped paying for this. No evidence of any significant neuropathy/weakness to preclude ability to walk assisted with a cane or perform all other ADL's. No evidence that claimant has confirmed MS [*multiple sclerosis*] or [*is*] receiving any specific treatment for this condition. No MRI testing of the brain, cervical, thoracic or lumbar spine to confirm demyelination. EMG/NCV [*electromyography / nerve conduction velocity*] testing showed evidence of polyneuropathy.[175]

---

[174] *See, e.g.*, https://rarediseases.org/rare-diseases/chronic-inflammatory-demyelinating-polyneuropathy/ ("Chronic inflammatory demyelinating polyneuropathy (CIDP) is a rare neurological disorder in which there is inflammation of nerve roots and peripheral nerves and destruction of the fatty protective covering (myelin sheath) over the nerves. This affects how fast the nerve signals are transmitted and leads to loss of nerve fibers. This causes weakness, paralysis and/or impairment in motor function, especially of the arms and legs (limbs). Sensory disturbance may also be present. The motor and sensory impairments usually affect both sides of the body (symmetrical), and the degree of severity and the course of disease may vary from case to case. Some affected individuals may follow a slow steady pattern of symptoms while others may have symptoms that stabilize and then relapse.") (last visited Feb. 20, 2019).

[175] Polyneuropathy is the most common form of a group of disorders known as peripheral neuropathy. It is "caused by damage to peripheral nerves (defined as all nerves beyond the brain and spinal cord). Peripheral nerves travel from the spinal cord to muscles, skin, internal organs, and

Claimant is being treated with neuropathic pain medication. Based on current documentation, claimant should be able to lift up to 20 lbs occasionally, less than this more frequently, sit up to 6 hours in an 8 hour work day with ability to stretch and/or change positions as needed for comfort. Claimant should be able to stand and walk (either or in combination) up to 6 hours in an 8 hour workday with ability to use gait assistance if needed (cane, etc). No evidence of active migraines or seizures. Claimant on medications for these conditions. No restrictions related to these conditions as appear controlled on medications.

*Id*. at 620-621 (alterations and footnotes supplied).

**M.  December 2015 and January 2016:** *Defendant requests additional medical information*

David Fitzgerald, a Group Insurance Claim Manager for defendant, mailed letters requesting additional medical information about plaintiff to Dr. Reed on December 31, 2015, and to Drs. LaGanke and Francis on January 5, 2016. The third paragraph of each letter recited the restrictions placed upon plaintiff by that physician. For example, the December 31st letter to Dr. William Reed observed:

According to the Attending Physician's Statement you completed on December 10, 2014, you stated "see attached." The attached document indicated the following lifting restrictions postoperatively: 5-10 pounds for 0-2 weeks, up to 15 pounds 2-4 weeks, up to 20 pounds 4-6 weeks, and up to 25 pounds up to 6-12 weeks. Additionally, you indicated no pushing or pulling beyond weight limitations/restrictions, no sitting or standing for prolonged periods of time, the ability to sit, stand or walk

glands. In polyneuropathy, many nerves throughout the body malfunction at the same time." Although there are different causes of polyneuropathy, the symptoms remain relatively constant and can include: pain; numbness; tingling or burning; hypersensitivity; and weakness in the arms or legs. https://www.virginiamason.org/polyneuropathy (last visited Mar. 26, 2019).

as needed, and you indicated Mr. Wiley was released to full duty without restrictions 12 weeks after surgery.

*Id*. at 1325.  The January 5th letter to Dr. Christopher LaGanke stated:

> According to the Attending Physician's Statement you completed on October 10, 2015, you stated Mr. Wiley was able to sit for four hours, stand for one to two hours, and walk for one to two hours.  Additionally you noted restrictions in driving/operating motorized equipment, lifting/carrying, use of hands and feet repetitively, bending, squatting, crawling, climbing and reaching above shoulder level.  Furthermore, you indicated driving was not advised given history of seizures, lifting/carrying was limited due to surgeries on neck and spine, and repetitive use of hands and feet was restricted due to numbness of upper and lower extremities.

Doc. no. 25, at 1317.  Finally, defendant's January 5th letter to Dr. David Francis recited that:

> According to the Attending Physician's Statement you completed on October 09, 2015, you stated Mr. Wiley was limited to sitting, standing and walking one hour each, and had restrictions in driving/operating motorized equipment, lifting/carrying, use of feet repetitively, bending, squatting, crawling and climbing.

*Id*. at 1321.

The fifth paragraph of each of the foregoing letters then observed that defendant's review of plaintiff's medical records had reached different conclusions:

> Our review has found Mr. Wiley would be precluded from performing his regular occupation for two months post-operatively.  Following the two months post-operative period and forward, our review has found the following restrictions and/or limitations would be appropriate:  lifting up to 20 pounds occasionally, less than this frequently; sitting up to six

hours in an eight hour workday with the ability to stretch and/or change positions as needed for comfort; and standing or walking up to six hours in an eight hour workday with ability to use gait assistance if needed.

See *id.* at 1317 (LaGanke); *id.* at 1321 (Francis); and *id.* at 1325 (Reed). In addition,

the tenth and eleventh paragraphs of each letter represented that

Mr. Wiley has had multiple conditions/symptoms chronically without evidence of a significant physical impairment on examinations/testing, following recovery from his surgeries. There is no evidence on file of any significant neuropathy/weakness to preclude the ability to walk assisted with a cane or perform all other activities of daily living. There is no evidence of any recurrent infections since going off of immune therapy, nor is there evidence Mr. Wiley has been confirmed to have MS, or is receiving any specific treatment for this condition. There is no MRI testing of the brain, cervical, thoracic or lumbar spine to confirm demyelination. EMG/NCV testing showed evidence of polyneuropathy and Mr. Wiley was being treated with neuropathic pain medication.

We do not have medical findings or documentation of consistent treatment to support Mr. Wiley's claim for Long Term Disability benefits beyond February 2015. It is for this reason this letter is being directed to your attention. Responding to this letter in a thorough and timely manner will allow for a prompt review of this case. To avoid the need for follow-up inquiry, you are encouraged to provide as much detail as possible with reference to the information you are using as a basis for your response or inferences. . . . .

See doc. no. 25, at 1318-19 (LaGanke); *id.* at 1322-23 (Francis); and *id.* at 1326-27

(Reed).

Defendant's Group Insurance Claims Manager concluded each letter by asking

each physician to either sign and return the letter, acknowledging his agreement with

the company's assessment, or to make any necessary changes:

> If you agree with this assessment, please acknowledge the same by signing in the space provided at the bottom of this letter and return it to us via fax at (402) 997-1865. If you wish to make changes, additions or deletions, please do so in the margins or attach an addendum and return the entire document to us at the above fax number.

> If you disagree, please respond with symptoms, physical exam findings, and diagnostic tests to support any restrictions (things he should not do) and limitations (things he cannot do).

> Your feedback is important to us; however, if we do not hear from you within 10 business days, we will proceed with our review based on the information currently in Mr. Wiley's file.

*See id*. at 1319 (LaGanke); *id*. at 1323 (Francis); and *id*. at 1327 (Reed).

Defendant asserts that none of plaintiff's physicians responded to its requests for additional information.

### N.  **January 5, 2016:** *Neurological evaluation*

On Tuesday, January 5, 2016 — the same date on which defendant mailed letters to Doctors LaGanke and Francis, requesting a response to the company's evaluation of plaintiff's qualification for long-term disability benefits — plaintiff was examined by Dr. LaGanke, who dictated the following notes of his evaluation:

> HPI: Mr. Wiley presents in follow up of his demyelinating disease. He states that he has felt either ice cold or hot in his lower extremities internally. He has had some bladder control problems. He has had three episodes of bowel incontinence without knowing it. He reports stumbling and difficulty with swallowing. He has had random panic

attacks. He states that his heart beats fast for no reason at times. He has neck pain where he has had his fusion. He has diffuse headaches at times. He has reflux frequently. He has passed out a few times sitting or standing. He states that he has had less cognitive flow and difficulty with his train of thinking. He can slur words for 15-20 seconds and then be able to sing again. He has also had an odd sense of an orgasm without being aroused. He has left the praise team at church because of his physical difficulties. He does take IVIG for his CIDP and feels that overall his sensory motor function is pretty stable.

Doc. no. 25, at 944.[176] Dr. LaGanke revised his diagnosis of plaintiff to include: syringomyelia[177] and syringobulbia[178]; CIDP; myelopathy; and LS (lumbosacral) radiculopathy.[179] He recommended that plaintiff obtain MRI scans of his cervical and thoracic spine (with and without contrast medium), and an MRI scan of his lumbar

---

[176] *See also* doc. no. 25, at 405 (same); *id*. at 643 (same); *id*. at 1251 (same).

[177] The National Institute of Neurological Disorders and Strokes defines "syringomyelia" as "a disorder in which a fluid-filled cyst (called a syrinx) forms within the spinal cord. This syrinx can get bigger and elongate over time, damaging the spinal cord and compressing and injuring the nerve fibers that carry information to the brain and from the brain to the rest of the body." https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Syringomyelia-Fact-Sheet (last visited Feb. 18, 2019).

[178] The National Organization for Rare Disorders defines "syringobulbia" as follows:

Syringobulbia is a neurological disorder characterized by a fluid-filled cavity (syrinx) within the spinal cord that extends to involve the brainstem (medulla). It usually occurs as a slit-like gap within the lower brainstem that may affect one or more of the cranial nerves, causing facial palsies of various kinds. In addition, sensory and motor nerve pathways may be affected by compression and/or interruption. This disorder is intimately associated with syringomyelia, in which the syrinx is limited to the spinal cord, and to the Chiari I malformation.

https://rarediseases.org/rare-diseases/syringobulbia/ (last visited Feb. 18, 2019).

[179] "Lumbosacral radiculopathy" refers to a disease process involving the lumbar spinal nerve root. It can manifest as pain, numbness, or weakness of the buttock and leg, and is typically caused by a compression of the spinal nerve root. *See, e.g.*, https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html (last visited Feb. 18, 2019).

spine (without contrast medium), and continue "IVIgG" (*i.e.*, *intravenous immunoglobulin G*) therapy.[180]  *Id*. at 946.

**O.     January 11, 2016:** *Defendant's occupational evaluation*

Defendant obtained an Occupational Analysis dated January 11, 2016 from Bethany Pyro, a Vocational Consultant employed by "University Disability Consortium." *See id.* at 904-05.[181]  Pyro concluded that plaintiff's position at Camber Corporation had required that he perform "analysis, acquisition support, financial support, contracts support, program office support, operations research, configuration and documentation control, general program guidance and expertise to customers." *Id*. at 904.  Such responsibilities most closely corresponded to the position listed in Dictionary of Occupational Titles as "Financial Analyst":  a job that is classified as requiring skilled, sedentary work.  *Id*.  Sedentary work requires:

> Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body.  Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

*Id*. at 905.  The physical demands of the job included occasional standing, walking, reaching, and accommodation; frequent handling, fingering, talking, hearing, and near

---

[180] IVIgG is a more advanced form of intravenous immunoglobulin therapy, but none of the records in the Administrative Record explain it adequately.

[181] *See also* doc. no. 25, at 1312-13 (same).

visual acuity; and constant sitting and keyboard use. *Id*.

**P.      January 27, 2016:** *MRI Scans*

On Wednesday, January 27, 2016, plaintiff was subjected to four MRI scans

at the direction of Dr. LaGanke.  The reports of each scan read as follows:

**1.  Lumbrosacral spine scan**

HISTORY:  Refractory low back pain.

TECHNIQUE:  Sagittal and axial images are obtained throughout the
lumbosacral spine without the administration of Gadolinium.

FINDINGS:
At L4-5, there is a broad-based disc protrusion with mild right neural
foraminal narrowing.

At L5-S1, there is a broad-based disc protrusion with mild right and
moderate left neural foraminal narrowing.  Within each of the lumbar
vertebral bodies, there is an oval area of increased signal on T1 and T2-
weighted imaging consistent with hemangiomata.

IMPRESSION:
1.  Mild lumbosacral spine degenerative disc disease.

2.  Multiple benign vertebral body hemangiomata.

Doc. no. 25, at 948.[182]

**2.  Brain scan**

HISTORY:  Demyelinating disease.

TECHNIQUE:  Sagittal, axial, and coronal images are obtained through

---

[182] *See also id*. at 1257 (same).

the cerebrum prior to the administration of Gadolinium.

FINDINGS:  No intracerebral mass, lesion or hemorrhage is identified. On T2 weighted imaging, there are no abnormal brain stem or cerebellar lesions identified.  After the administration of Gadolinium, there are no abnormal areas of enhancement.  On T1 weighted imaging, there are no abnormal hypointense lesions.

IMPRESSION:
Normal cranial MRI scan.

*Id*. at 949.[183]

### 3.  Cervical spine

HISTORY:  Multiple sclerosis.

TECHNIQUE:  Sagittal and axial are obtained throughout the cervical spine with the administration of Gadolinium.

FINDINGS:  At C5-6, there is a broad based central disc protrusion but not significant central or neural foraminal narrowing.  The remainder of the intervertebral disc spaces and vertebral bodies appear normal.  The craniocervical junction is normal.

IMPRESSION:
Minimal cervical degenerative disc disease.

*Id*. at 950.[184]

### 4.  Thoracic spine

HISTORY:  Myelopathy.

TECHNIQUE:  Sagittal and axial are obtained throughout the thoracic

---

[183] *See also id*. at 1256 (same).

[184] *See also id*. at 1255 (same).

spine with the administration of Gadolinium.

FINDINGS:  The intervertebral disc spaces and vertebral bodies appear normal.  The intrinsic qualities of the thoracic spinal cord appear normal.

IMPRESSION:
Normal thoracic spine MRI.

*Id*. at 951.[185]

### 5.  Analysis of the four MRI scans

The following letter, summarizing the results of the January 27, 2016 MRI scans, was mailed to plaintiff from Dr. LaGanke's office on Thursday, March 3, 2016:

Dear BOBBY WILEY,

*The MRI of the cervical spine you recently had done shows cervical degenerative disc disease.*  The mri [*sic*] of the thoracic spine was normal.  The mri [*sic*] of the lumbar spine shows no change from [the] previous scan done 10/21/2013.  The mri [*sic*] of the brain was stable.  If you have questions, please call our office.

*Id*. at 1261 (emphasis and alterations supplied).

### Q.  **February 4, 2016:**  *Defendant's denial of plaintiff's claim*

Defendant mailed a letter to plaintiff on Thursday, February 4, 2016, denying his claim for long-term disability benefits.  Plaintiff was informed that, even though disability was supported for the period of December 9, 2014 through February 16, 2015 (67 days), no benefits were payable because the ninety-day elimination period

---

[185] *See also id*. at 1254 (same).

had not been satisfied.  *See id*. at 980.[186]

Plaintiff also was informed that none of his physicians had responded to defendant's request that each physician state whether he agreed with defendant's assessment that plaintiff was capable of performing sedentary work; and, if the physician disagreed, to respond with a statement of the symptoms, physical exam findings, and diagnostic tests that supported any restrictions and limitations on plaintiff's activities of daily living.  In summary, defendant stated that plaintiff's medical records revealed that he

> had multiple chronic conditions without evidence of a significant physical functional impairment on examinations/testing, following the recovery from your surgeries.  There is no evidence on file of any significant neuropathy or weakness to preclude the ability to walk assisted with a cane or perform all other activities of daily living.  There is no evidence of any recurrent infections since going off of immune therapy, nor is there evidence you have been confirmed to have MS, or are receiving any specific treatment for this condition.  There is no MRI testing of the brain, cervical, thoracic or lumbar spine to confirm demyelination. EMG/NCV testing showed evidence of polyneuropathy and you were being treated with neuropathic pain medication.  At present, we do not have medical documentation on file that confirms restrictions and limitations that would preclude you from performing your Regular Occupation as a DGANA3 beginning February 17, 2015.  Based on the information currently available, disability is supported for the period of December 09, 2014 through February 16, 2015, however, your elimination period extends through March 09, 2015.  Therefore, no benefits are payable, and your claim has been denied.

---

[186] The same correspondence discussed in this section is found in doc. no. 25, at 1300-06.

Doc. no. 25, at 984-85.[187]

**R.     March 28, 2016:** *Plaintiff's initial response to defendant's denial*

Plaintiff's initial response to defendant's February 4th denial of his claim was the following email, transmitted on Monday, March 28, 2016:

Mr. Fitzgerald,

I'm sorry that it's been almost 2 months since your LTD denial letter that I'm just now contacting you, but due to sickness, multiple deaths in my family, and numerous attempts at contacting the Mutual of Omaha STD division, I'm just now having the opportunity to reach out to you.  I believe your LTD denial was in error so I will be filing an appeal as well as turning this matter over to my lawyer since I've now been out of work for almost a year and a half due to serious health issues.

You mentioned in the denial letter that one reason for the denial was that I had not exhausted the last week of STD.  That was surprising news to me as I had thought that I had completed the STD period.  I will say that the STD division has been awful at communicating with me, often leaving me in the dark as to what has been going on with my claim.  They won't return my calls and it takes an act of God to reach them on the phone.  I do require your assistance if you are so inclined to help me.  I need to know the name of my STD representative at Mutual of Omaha as well as as [*sic*] their contact information as I am unable to get that division to respond to me.  I need to know the exact reason that they have failed to complete my remaining week of STD.  If it's info that they need from me, I will get it for them.  If they need info from my doctors, then I need to know which one and what info they need so that I can put pressure on the appropriate doctor to provide it so that the STD portion of my claim can be completed.  If you can provide the STD claim number, that will also be great.

---

[187] *See also id*. at 1304-05 (same).

Regarding the LTD claim that you represented for me, based on your letter, you heavily rely on information from the doctors at Laser Spine Institute in Tampa, FL. You should be made aware that they have not treated nor seen me since December 2014 so they are unaware of my other health issues since that time that forced me to go on LTD. You should also know that the lumbar surgery they performed on me has failed and is again in the state it was in which prompted the surgery in December 2014. I have MRIs to support that claim.

You should also know that I have MetLife as a supplement to the LTD policy I have with Mutual of Omaha. Y'all are responsible for 60% of my pay, and they are responsible for an additional 20%, so that it amounts to 80% of my former pay when I was able to work. Based on my claim with them (MetLife), they approved my LTD claim in November 2015 so I'm puzzled as to why Mutual of Omaha is having such a problem with approval of their portion.

I look forward to your reply. If you would be so kind to include the STD information I requested, I would be grateful.

*Id*. at 1272-73.[188]

## S.     **February 18, 2016:** *Examination by Dr. Francis*

Plaintiff returned to the office of his primary care physician, Dr. David A. Francis, on Thursday, February 18, 2016, for a regular health maintenance visit. He was walking with the aid of a cane. *See id*. at 660.[189] "Chronic back pain" was among the conditions addressed. Plaintiff stated that he was "Still hurting in neck and wearing brace for lower back." *Id*. at 658.[190] Physical examination revealed

---

[188] *See also id*. at 1272-73 (same).

[189] *See also id*. at 972 (same).

[190] *Id*. at 970.

"Tenderness . . . in the cervical spine and paracervical muscles left right,"[191] as well as "Mild tenderness diffusely in legs." *Id*. at 660.[192] Dr. Francis prescribed 4 mg. Zanaflex tablets, to be taken two times each day (*i.e.*, a total of 8 mg. each day). *Id*. at 661.

**T.** **May 9, 2016:** *Examination by Dr. LaGanke*

Plaintiff returned to the office of Dr. LaGanke on Monday, May 9, 2016, for a follow-up evaluation of his "demyelinating disease" (Multiple Sclerosis). Dr. LaGanke's notes of his examination read as follows:

> Dr. Francis adjusted his Zanaflex from 4 mg to 8 mg tid. He has been more sleepy but has had a few less spasms. He states that his bowel and bladder have worsened and that he has lost control and has spasms and back pain when he gets up. He reports random times where he will not remember anything that has gone on for a short period of time. He has had knife like feelings in his scapula.[193] It feels as if his bone is vibrating outward. He will have a cold feeling in general like it is coming from his bone and then he will have a vibratory sensation and scalding sensation. He has electric jolts in his left shoulder and in his genital area. He states that his dysautonomia[194] has been giving him a

---

[191] "Ligaments, *along with the paracervical muscles in the cervical spine*, prevent motion between vertebrae that might injure the spinal cord or nerve roots. . . . Running vertically along the anterior and posterior aspects of the vertebral bodies, the anterior and posterior longitudinal ligaments attach to the discs as well." https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html (emphasis and ellipsis supplied) (last visited Feb. 18, 2019).

[192] *See also* doc. no. 25, at 972 (same).

[193] The scapula is "the flat, triangular bone in the back of the shoulder, articulating with the ipsilateral clavicle and humerus," also called the shoulder blade. DORLAND'S at 1661.

[194] Dysautonomia refers to a disorder of the functioning of the autonomic nervous system ("ANS") that generally involves failure of the sympathetic or parasympathetic components of the ANS. *See*, *e.g.*, https://my.clevelandclinic.org/health/articles/6004-dysautonomia (last visited Feb. 18, 2019); http://www.dysautonomiainternational.org/page.php?ID=34 (stating that the autonomic

lot of problems.  He gets light headed when he arises.  He states that with his memory problems he is unable to play mind games on the computer.  He denies any dysphagia or dysarthia. He states that he has tolerated the IVIG well for his CIDP.  He has not noticed any progression of his shocking like numbness.

Doc. no. 25, at 652 (footnotes supplied).[195]  Dr. LaGanke diagnosed plaintiff as suffering from syringomyelia, syringobulbia, CIDP, fibromyalgia, myelopathy, lumbosacral radiculopathy,[196] and dysautoonomia.  *Id*. at 654.[197]

**U.    May 10, 2016:** *Initial appeal*

The day after plaintiff's examination by Dr. LaGanke, he submitted the following appeal of defendant's denial of his claim.[198]

To Whom It May Concern:

My name is Bobby Johns Wiley, and I have been totally, permanently disabled since December 8, 2014.  It began when I required multiple spine surgeries to correct what was then believed to be several, severely herniated discs.  Once having traveled out-of-state to have the

---

nervous system controls the "automatic" functions of the body that persons do not consciously think about, such as heart rate, blood pressure, digestion, dilation and constriction of the pupils of the eye, kidney function, and temperature control, and noting that persons living with various forms of dysautonomia have trouble regulating such systems, which can result in lightheadedness, fainting, unstable blood pressure, abnormal heart rates, malnutrition, and in severe cases, death) (last visited Mar. 26, 2019).

[195] *See also* doc. no. 25, at 953 (same).

[196] "Lumbosacral radiculopathy" refers to a disease process involving the lumbar spinal nerve root.  It can manifest as pain, numbness, or weakness of the buttock and leg, and is typically caused by a compression of the spinal nerve root. *See, e.g.*, https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html (last visited Feb. 18, 2019).

[197] *See also* doc. no. 25, at 955 (same).

[198] An employee of defendant stamped the letter as received on May 13, 2016.

repairs made to the spinal discs, one was found to have ruptured and thus required a cervical fusion as it was too badly damaged and was impinging on the spinal cord. At that time it became evident that I would be out of work 12 weeks to recover from the intensiveness of the surgeries. The doctors at Laser Spine Institute (LSI) set my Return To Work date as March 4, 2015.

After having returned home from the surgeries on December 20, 2014, I was scheduled to have a set of follow-up x-rays taken at the 6-week mark and again at the 12-week mark. The x-rays would be taken locally since I lived so far away from LSI which was located in a different state. Once the x-rays were taken, they would then be sent electronically to LSI for them to evaluate my healing progress as best they could since they couldn't see me in person due to the distance between us. As the x-rays were evaluated, someone from LSI would contact me via telephone to inform me of the prognosis. At the 6-week mark, they commented on how much arthritis had already built back into the surgical area that they had cleaned out during surgery. We discussed some issues I was having from both surgical sites, but they assured me that with some additional time, things would begin to get better. Because I lived so far away from them, it was difficult to accurately treat me via telephone. That's why when I left LSI in December 2014, they turned my care back over to my local doctors as they could evaluate me more closely and in person.

As time progressed closer to the date I was scheduled to return to work, I had to make appointments with several of my local doctors to have other health issues checked out. During this time I was diagnosed as having seizures and demyelinating neuropathy on top of all the other health issues I had been diagnosed and plagued with previously, the most debilitating of those being fibromyalgia, disautonomia, and migraines, not to mention the degenerative arthritis throughout the body. It also was evident that my two surgeries weren't healing back as had been hoped. The MRIs that my neurologist scheduled for me in January 2016 confirms [*sic*] what we suspected, that the surgical sites are now as bad as they were when I traveled out-of-state to have the surgeries. Regardless, the tampering with the spine for the surgeries has sent the

fibromyalgia into overdrive, and it's been at that level since. To date we've been unable to find a medication that will give me any relief that doesn't cause some other serious health issue to arise or that keeps me in a comatose state.

Because of the culmination of circumstances, I was forced to go on total, permanent disability at my doctors['] recommendations as things weren't going to get any better as I aged. The fibromyalgia pain was already severe but is now non-stop with very little relief ever if any. Due to the decline in my health, it became evident that I would be unable to return to work, and that I would need to begin the process of filing for Long Term Disability (LTD). Since I have both a primary and secondary LTD policy, I filled out the necessary paperwork with Mutual of Omaha and MetLife respectively. MetLife eventually approved my claim in November 2015. However, Mutual of Omaha has repeatedly given me the run around and eventually denied my claim stating that I had failed to complete the Short Term Disability (STD) elimination period as well as prove that my condition warranted Long Term Disability. In the denial letter, the Mutual of Omaha representative even went so far as to alter the Return to Work date from that which the doctors had recommended based on their expert opinion of the situation. I'm not quite sure how the representative has the authority to alter anything my doctors have stated, particularly since the Mutual of Omaha representative isn't a doctor nor has he examined me.

Because it was stated that I had NOT completed the STD elimination period, I contacted my Mutual of Omaha STD representative to find out what was going on. After placing multiple calls over a two week period (since they would never return my calls), I finally made contact with my STD representative. Upon explaining the situation and her evaluating my case, she too was puzzled at why the last week of my STD claim was never paid even though it was flagged as being approved in the system. She stated that she would get the claim corrected so that the final STD claim check would go out in the mail that day. I received it about a week later.

As for not proving that LTD was warranted, the representative

claims that he never received my records from one of the doctors. However, on two separate occasions, the doctor showed me my entire file that he was putting in the mail to Mutual of Omaha, and it was addressed to the Mutual of Omaha representative. When the representative contacted me a second time about the absence of the doctor's file, I took the letter to my doctor who then called the representative to get his exact mailing address. Based on what was stated in the denial letter the representative still claims that he never received either package that contained my records. Neither package was returned back to the doctor as being undeliverable so someone at Mutual of Omaha LTD has to have both packets.

In the Mutual of Omaha representative's own words on page 5 of the denial letter, he describes conditions of that of an invalid instead of someone who is disabled. He states that "there is no evidence on examinations [*sic*] that you were accompanied to visits, required a driver, required assistance getting on and off of examination tables, unable to perform your own activities of daily living, shop for personal needs, perform household chores or handle your personal finances." To be absolutely clear on this matter, I am a disabled individual; I am not an invalid that is totally bedridden. The Mutual of Omaha representative nor any of my doctors live in my household so no one witnesses those times when my wife has to do things for me like run errands, pick up my medicine, fix meals, do household chores, drive me places, etc.[,] so it is rather bold that the representative would actually make such a blatant statement as ludicrous as this which could open your company to legal action for denying a claim.

I ask that my claim be reevaluated immediately and given due consideration. You should have the complete records of Dr[.] David Francis (my General Practitioner) still on file. His records should contain the assessment from Dr[.] Kevin Meyers regarding the Fibromyalgia and Degenerative Arthritis. To assist you, I am enclosing my full case file from Dr[.] Chris LaGanke (my Neurologist) and Dr[.] Sid Sawyer (my Chiropractor). I have also enclosed the Mutual of Omaha denial letter, the LSI Return to Work paperwork, the Mutual of Omaha LTD claim paperwork (with additional notes added), the

MetLife LTD claim paperwork, as well as the MetLife LTD approval letter.

*Id*. at 664-65 (alterations supplied).[199]

**V.    June 21, 2016:** *Defendant's neurological evaluation of plaintiff's file*

Defendant assigned Dr. Alan Neuren, a neurologist, to conduct an independent review of plaintiff's file.   After reviewing all of plaintiff's medical records, Dr. Neuren's June 21, 2016 report concluded that plaintiff's headaches were controlled, that no records demonstrated problems with arthritis or dysautonomia, and that there was no objective support for syncopal episodes.   Dr. Neuren stated:

- When seen on 02/16/15 by Dr. LaGanke, he reported a spinning sensation in his head that was worse with driving.   He reported having to focus to avoid passing out followed by instant migraine and fatigue.   He reported having syncope [*i.e.*, *a temporary loss of consciousness usually related to insufficient blood flow to the brain*] with 25% of these episodes. He reported spinning episodes 4-5 times a week and 2-3 migraines a month, staring episodes, partial incontinence.   Insured stated he he [*sic*: *¿ when he* ?] sat too long, he would get numbness and tingling in his legs.   He reported having a few falls a month.   No injuries were reported.   On exam, he was noted to have several trigger points.   Gait was reported to be slow with lag of the left leg.   Reflexes were +2 and symmetrical.   There was no weakness or sensory loss.   Insured was opined to have IgG deficiency [*i.e.*, *a health problem in which the body does not produce sufficient Immunoglobulin G* (IgG):   *the most common antibody found in a person's blood* ], demyelinating disease [*i.e.*, *a disease of the nervous system in which the protective covering (myelin sheath) surrounding nerve fibers in a person's brain, optic nerves, and spinal cord is damaged, thereby slowing or stopping nerve impulses*

---

[199] *See also* doc. no. 25, at 977-78 (same).

*and causing neurological problems*], syncope, vertigo [*i.e., a sensation of spinning dizziness*], and migraine. Dr. LaGanke ordered an EEG. He was to continue Vimpat [*i.e., a medication used to treat partial-onset seizures*].

- Dr. LaGanke for years has opined the insured has demyelinating disease. This usually is in reference to multiple sclerosis, but MRIs are not consistent with demyelinating disease. Neurological exams have not shown any findings consistent with a central nervous system abnormality. At the initial visit with Dr. LaGanke, reflexes were mildly hyperactive, but symmetrical. No plaques have been seen on MRIs of the brain or spinal cord.

- Insured's reflexes were always present until after he had electrodiagnostic studies. Subsequently they were reported to be absent. Review of the electrodiagnostic studies shows some mild slowing in the lower extremities, but there was not temporal dispersion of the CMAPs [*i.e., compound muscle action potentials*[200]] or nerve block. Distal motor latencies [*i.e., the time lapse between a stimulus affecting a nerve to the motor or sensory response being recorded, usually measured in milliseconds* [201]] were not prolonged or 50% greater than upper limits of normal. No spinal fluid exam was done. EMG was normal and insured has shown no atrophy and only minimal if any weakness of the iliopsoas muscles[202] with no evidence of progression elsewhere. Findings and presentation are not consistent with CIDPP.

---

[200] *See, e.g.*, https://www.sciencedirect.com/topics/medicine-and-dentistry/compound-muscle-action-potential (last visited Mar. 26, 2019).

[201] *See, e.g.*, www2.med.wayne.edu/.../Neuro/Pathophys%20-%20Neuro%20-%20electrophys .doc (last visited Mar. 26, 2019).

[202] The iliopsoas muscle is "a compound muscle consisting of iliacus and psoas major." DORLAND'S at 1206. The iliac muscle has its origin at the base of the sacrum, inserts to the greater psoas tendon and lesser trochanter of the femur, and acts to flex the thigh and trunk. *Id.* The greater psoas muscle has its origin at the lumbar vertebrae, inserts into the lesser trochanter of the femur, and acts to flex the thigh or trunk. The smaller psoas muscle has its origin at the last thoracic and first lumbar vertebrae and acts to flex the trunk. *Id.* at 1209.

- Insured has been complaining of chronic pain. He did undergo lumbar and cervical surgery. Dr. Reed noted no evidence of disc displacement on the lumbar nerve roots.

- Records contain inconsistencies. Insured reports to Dr. Reed and his associates that he had good relief from the surgery, but told Dr. LaGanke, it was of no benefit. He has reported blacking out and falling several times, but has not sustained any injuries. Other than a single EEG, no further studies or evaluations were done for what would be a serious issue.

- Insured was on IVIG [*i.e.*, *intravenous immunoglobulin*] for an extended period for reasons that are totally unclear. The mild reduction of one subclass of IgG in serum electrophoresis would not be an indication for using this modality. Insured was never referred to an immunologist to have this evaluated.

- Despite varying complaints of urinary and fecal incontinence, this was never worked up.

- Records indicated insured is on an inordinate amount of medications which can cause problems with mental clarity, lightheadedness, and fatigue. The need for many of these agents is questionable. Dr. Myers recommended insured not be on Tramadol, but he has been continued on it for many years.

*Id.* at 923-24 (alterations and footnotes supplied).

Dr. Neuren ultimately concluded that, aside from a "normal recovery period" from his surgeries, plaintiff "should be capable of lifting up to twenty pounds occasionally, sitting for six hours a day allowing for periodic changes of position. He should be able to ambulate with assistance of a cane if needed. Insured's complaints are out of proportion to his findings on diagnostic studies and exams." *Id.* at 924.

**W.    June 22, 2016:**  *Defendant's denial of plaintiff's appeal*

Defendant upheld its decision to deny plaintiff's long-term disability benefits

by letter dated Wednesday, June 22, 2016.  The letter summarized plaintiff's medical

records that had been generated after February 17, 2015, and stated:

> Our review of the file notes a long history of migraine headaches treated with medications.  There is no indication of a need for restrictions or limitations for your headaches.  The records do not document seizure activity.

> Fibromyalgia has been reported.  There is no indication of restrictions or limitations due to this diagnosis.

> The file contains no records of X-rays to document problems with arthritis.

> The records note complaints of a demyelinating disease.  MRI studies have not been consistent with demyelinating disease, showing no plaques on your brain or spinal cord.  An EMG study was normal.  The records do not indicate any atrophy.  Only minimal weakness is noted.  Neurological examinations have not shown any findings consistent with a central nervous system abnormality.  The physical examination findings are not consistent with chronic inflammatory demyelinating polyneuropathy ["CIPD"] or multiple sclerosis.

> Reports of falls are noted in the records.  There is no evidence of injuries sustained in falls.  There is no indication of a need for emergency care following falls.  Due to the reports of an antalgic gait the use of a cane may be reasonable to assist with ambulation.

> There have been complaints of dysautonomia.  There are no records in file to document dysautonomia.

> There have been complaints of urinary and fecal incontinence.

There is no evidence of a workup for these complaints. There would be no restrictions or limitations for these complaints.

Problems with cognition have been reported. There is no evidence of an inability to perform the activities of daily living. The records note your ability to operate a motor vehicle. The records contain no evidence of testing to document a decrease in cognitive ability.

As noted above this claim started following your surgical procedures in December 2014. Due to your surgical procedures you should avoid heavy lifting. The ability to take a short break to stretch and walk would be reasonable. These restrictions would not preclude you from performing the duties of a light or sedentary strength demand position.

Gastroesophageal reflux disease was reported and is treated with medication. There is no indication of restrictions or limitations for this diagnosis.

Panic attacks were reported. There is no indication of referral to a mental health care professional. There is no indication of a need for emergency care, outpatient treatment or hospitalization for a mental health disorder.

In summary, we acknowledge you were impaired due to your December 2014 procedures. Restrictions and limitations to preclude work would have been expected to February 17, 2015. The records do not support restrictions or limitations in your physical or mental functional capacity to preclude a return to work at your regular occupation from February 17, 2015, and ongoing. Therefore, we have upheld the prior claim denial and no benefits are payable for your claim.

*Id*. at 914-15 (alteration supplied).

— End —